# In the United States Court of Federal Claims

## Case No. 10-738C
(**FILED**: February 14, 2013)
### NOT TO BE PUBLISHED

****************************************************

| | |
|---|---|
| LUIS A. JARDON, | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES OF AMERICA, | * |
| Defendant. | * |
| | * |

****************************************************

**James Sargent**, Dallas, TX, Counsel of Record for Plaintiff.

**Nicholas Jabbour**, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., Counsel of Record for Defendant. With him were **Tony West**, Assistant Attorney General, Civil Division, and **Jeanne E. Davidson**, Director, Commercial Litigation Department. **Major Elizabeth A. Walker**, Department of the Army, U.S. Army Litigation Division, Arlington, VA, of counsel.

**Mary Gilbert**, law clerk.

## OPINION

## BASKIR, Judge.

I.   Introduction

This claim for military disability retirement pay comes before the Court on Cross-Motions for Judgment on the Administrative Record. Plaintiff, Luis A. Jardon, was separated from the Army because of a physical disability on April 15, 2006.  The Army Disability Agency assigned him a disability rating of 10 percent and authorized disability severance pay

at the E-5 pay grade.  Mr. Jardon filed an application for correction of his military records with the Army Board for Correction of Military Records ("ABCMR"); an application for review of his discharge from the Armed Forces, which the ABCMR treated as a request for reconsideration of his first ABCMR application; and a petition with the Physical Disability Review Board ("PDBR").  Each application requested that Mr. Jardon's disability rating be raised to at least 30 percent and asserted that he should have been medically retired, rather than separated for disability.  All three applications were denied.  At the time of the ABCMR and PDBR proceedings in his case, the Department of Veterans Affairs ("VA") had rated Mr. Jardon as 60 percent disabled.  The VA raised that rating to 80 percent, effective as of July 1, 2009.

Mr. Jardon alleges that the decisions of the Department of the Army in his case have been arbitrary, capricious, contrary to law, and not supported by substantial evidence.  In his Complaint, Mr. Jardon stated that he is seeking (1) back disability retirement pay and allowances as a retired E-5 from April 15, 2006, to the date of judgment; (2) correction of his military records to reflect that he completed active duty on April 15, 2006, as an E-5 and that his discharge was due to temporary or permanent disability retirement; (3) reimbursement for all out-of-pocket medical expenses incurred during the time that he did not have medical care from the Department of Defense or the Department of Veterans Affairs; (4) attorneys' fees and costs; and (5) any other relief that the Court deems proper, pursuant to 10 U.S.C. § 1201-1202.  However, Mr. Jardon indicated in his briefs, and confirmed at oral argument, that he is seeking only a remand of his case for re-evaluation by the Army correction boards.   *See* Plaintiff's Response to Defendant's Reply to Plaintiff's Response to Defendant's Motion for Judgment on the Administrative Record ("Pl's. Resp.") at 2.

Because we find that the Army correction boards' decisions were not arbitrary, capricious, or contrary to law, we **DENY** Plaintiff's Cross-Motion for Judgment on the Administrative Record and **GRANT** Defendant's Motion for Judgment on the Administrative Record.

II.   Background

A.   Procedural History

On December 16, 2005, the Medical Evaluation Board ("MEB") examined Mr. Jardon and determined that he had three medical conditions, two of which did not meet the Army's retention standards.  Mr. Jardon was then referred for an informal Physical Evaluation Board ("PEB") proceeding.  On February 7, 2006, the informal PEB found that Mr. Jardon was physically unfit for duty based on one condition, chronic left wrist pain, and recommended that Mr. Jardon be given a disability rating of 10 percent and be separated from the Army with severance pay.  Mr. Jardon was discharged from the Army on April 15, 2006, with a disability rating of 10 percent.  Mr. Jardon filed an application with the ABCMR in December 2008, seeking correction of his military records.  Mr. Jardon filed an application for review of his discharge from the Armed Forces on April 8, 2009, before the ABCMR issued a decision on his first petition.  The ABCMR denied Mr. Jardon's first application on April 23, 2009.  The ABCMR treated Mr. Jardon's application for review of his discharge from the Armed Forces as a request for reconsideration of the denial of his original ABCMR application, which the ABCMR also denied on February 10, 2010.  Mr. Jardon also filed an application with the PDBR seeking a review of his disability rating.  After a hearing, the PDBR issued a decision on November 10, 2009, recommending no re-characterization of Mr. Jardon's separation and disability rating.  The Deputy Assistant Secretary of the Army accepted the PDBR's recommendation and, on November 18, 2009, denied Mr. Jardon's application for reconsideration of his separation and disability rating, and notified Mr. Jardon that his recourse within the Department of Defense and Department of the Army had been exhausted.

Plaintiff filed a Complaint with the U.S. Court of Federal Claims on October 28, 2010.  Defendant filed a Motion for Judgment on the Administrative Record on June 6, 2011.  Plaintiff filed a Cross-Motion for Judgment on the Administrative Record on July 7, 2011, and Oral Argument was held on February 24, 2012.  We set forth in unusual detail the legal analysis regarding each of Mr. Jardon's claims, as Mr. Jardon clearly feels that his arguments have not been fairly considered up until this point.

B.    Factual Background

    i.    Medical Conditions Leading to Plaintiff's Referral to the
          MEB

Mr. Jardon enlisted in the Texas Army National Guard on December 15, 1999, and subsequently enlisted in the United States Army on May 15, 2001.  He re-enlisted in the Army on February 22, 2004.  Mr. Jardon rose to the rank of Sergeant.  He served in Iraq from March 29, 2003, to March 17, 2004, as well as in Korea for dates unspecified.

Mr. Jardon had a ganglion cyst removed from his left wrist on May 3, 2002.  Following the procedure, he reported persistent weakness and paresthesias in his left wrist.  AR Tab 25 at 252-53.  However, in March 2003, he was deployed to Iraq for approximately one year.  AR Tab 26 at 297.  He was in the process of seeking review by the MEB prior to his deployment to Korea, but the process was stopped without explanation.  AR Tab 25 at 253.

In July 2005, Mr. Jardon was evaluated at a medical clinic at Camp Humphries, and was found to be unable to lift or carry over fifteen pounds in his left hand or to perform push-ups.  Because of these limitations, Mr. Jardon was assigned to a Medical Holding Detachment at Fort Hood and recommended for the MEB.  AR Tab 25 at 281, 283-84.

Mr. Jardon filled out several medical history forms and was evaluated by several doctors leading up to the MEB proceeding.  A Medical History form filled out by Mr. Jardon on August 24, 2005, indicated a number of health problems.  When asked if he ever had or was then experiencing a list of conditions, Mr. Jardon checked yes for: "asthma or breathing problems related to exercise;" "weather, pollens, etc.;" "shortness of breath;" "wheezing;" "a chronic cough or cough at night;" "ear, nose, or throat trouble;" "worn contact lenses or glasses;" "foot trouble;" "knee trouble;" "tumor, growth, cyst, or cancer;" "dizziness or fainting spells;" "frequent or severe headaches;" "a head injury, memory loss or amnesia;" "seizures, convulsions, epilepsy or fits;" "meningitis, encephalitis, or other neurological problems;" "pain or pressure in the chest;" "palpitation, pounding heart or abnormal heartbeat;" "heart trouble or murmur;" "nervous trouble of any sort;" "loss of memory or amnesia, or neurological symptoms;" "frequent trouble sleeping;" "received counseling of any type;"

4

"and depression or excessive worry."  AR Tab 25 at 265-73.   Under "Explanation of Yes Answers," Mr. Jardon elaborated on many of these alleged conditions.  Regarding his breathing problems, Mr. Jardon stated that he had been experiencing breathing problems since his time in Iraq, mostly at night when he would wake up unable to breathe, but he had also experienced "hyperventilating" after little physical work.  Mr. Jardon indicated that his ears "ring a lot and pop a bit" causing headaches and a loss of balance, and that, when his ears acted up, it felt like he lost his hearing for several hours, up to as long as a full day.  Explaining his "No" answer to the question, "currently in good health," Mr. Jardon stated that, for over three years, he had been experiencing chronic left wrist pain, right shoulder pain, chest pains, and breathing problems.  Mr. Jardon also indicated that he had been diagnosed with vertigo on January 27, 2005.  Mr. Jardon also reported several instances in which he felt his heart speed up and said he was told that, when he could not breathe or his heart sped up, he was experiencing anxiety attacks.  Mr. Jardon also stated that he had trouble sleeping and that he "worr[ied] a lot" after coming home from Iraq, getting a divorce, and being referred to the MEB.  AR Tab 25 at 264-273.  On the August 24, 2005 Medical History form, Mr. Jardon made no mention of any problems with his right wrist or arm.  He checked "no" next to the question: "[h]ave you ever had any illness or injury other than those already noted?"

Mr. Jardon reported on a Medical Assessment form dated August 25, 2005, that his health was deteriorating.  He reported that he had undergone surgery on his left wrist in May 2002, and that he had been treated for vertigo at the emergency room on January 27, 2005.  He stated that his right shoulder "pop[ped] a lot and bother[ed] [him] a bit."  When asked about other health concerns, he mentioned sleeplessness, use of his left hand, chest pains, and difficulties breathing.  He stated that he intended to seek disability from the VA based on the limited use of his left hand and ringing in his ears, or "tinnitus".  AR Tab 25 at 274.  Again, the August 25, 2005 Medical Assessment form did not mention Mr. Jardon's right wrist or arm.

Dr. Janeen Easter examined Mr. Jardon on August 26, 2005, and on a "Report of Medical Examination" form assessed Mr. Jardon as "abnormal" in two categories: "[u]pper extremities" and "[i]dentifying body marks, scars, tattoos."  Dr. Easter checked "normal" or "not evaluated" for every other category listed.  She noted that Mr. Jardon's had "limited movement" and

"decreased flexion, extension, radial and ulnar deviation" in his left wrist, and a scar on his left wrist.  AR Tab 25 at 262.  Under "Summary of Defects and Diagnoses," Dr. Easter listed just Mr. Jardon's left wrist condition.  However, under "Recommendations," she wrote "consult to psychology for anxiety/stress."  AR Tab 25 at 264.

Dr. Ben Kirk Phillips performed a psychiatric evaluation of Mr. Jardon on September 26, 2005.  Based on Mr. Jardon's referral paperwork, intake questionnaire, a clinical interview, and a mental status examination, Dr. Phillips concluded: "I do not feel that SPC Jardon suffers from a psychiatric disorder that warrants inclusion in his medical evaluation board."  In particular, he noted that Mr. Jardon's difficulty sleeping was never severe enough for Mr. Jardon to seek treatment.  AR Tab 25 at 256.

On October 31, 2005, Mr. Jardon was examined by Dr. Josef Otto. Mr. Jardon's chief complaint was left wrist pain and numbness in his ring and small finger of his left hand.  However, under "Problems," Dr. Otto noted that Mr. Jardon was experiencing "Adjustment Disorder with Anxiety," "Adjustment Disorder," "Anxiety Disorder," and "Adjustment Disorder with Anxiety and Depressed Mood."  However, the form also indicated that Mr. Jardon had no psychiatric diagnosis.  Dr. Otto found that Mr. Jardon's left wrist showed decreased motion and grip, and that he had fair to poor rehabilitation potential.  He diagnosed Mr. Jardon with cubital tunnel syndrome, prescribed occupational therapy, gave Mr. Jardon splints and ulnar nerve glides to wear, and recommended an electrodiagnostic study. AR Tab 25 at 258-59.

ii.    MEB and PEB Findings

Dr. Luke Miller conducted Mr. Jardon's MEB evaluation on December 16, 2005.  Dr. Miller's MEB report indicated that his evaluation took into consideration physical examinations of Mr. Jardon's left wrist, as well as an "EMG nerve conduction study" performed on Mr. Jardon's left wrist in 2002.  The 2002 study of Mr. Jardon's left wrist "revealed findings consistent with ulnar neuropathy at the left elbow."  AR Tab 25 at 254. Dr. Miller characterized Mr. Jardon's left wrist pain as "constant and moderate."  Dr. Miller predicted that Mr. Jardon would not experience "any significant recovery" for his left wrist injuries.  Under "Final Diagnosis," Dr. Miller wrote: "1) Chronic left wrist pain, status post ganglion cyst removal with persistent decrease of normal range of motion.  2) Cubital

tunnel syndrome affecting left upper extremity, resulting in an ulnar nerve neuropathy." AR Tab 25 at 255. Dr. Miller's "Recommendation" stated that Mr. Jardon failed to meet retention criteria because the joint range of motion for his upper extremities did not "equal or exceed the measurements" listed in Army Regulation 40-501, which governs medical fitness standards for retention and separation. *See* Army Regulation ("Army Reg.") 40-501, ¶1-1 (2011).

DA Form 3947 dated December 16, 2005, the same day as         Mr. Jardon's MEB proceeding, stated that the MEB found that Mr. Jardon had three medical conditions: chronic left wrist pain, left cubital tunnel syndrome with neuropathy, and difficulty sleeping. The MEB found that Mr. Jardon's chronic left wrist pain and left cubital tunnel syndrome did not meet retention standards in accordance with Army Reg. 40-501, but that his difficulty sleeping did meet the retention standards. AR Tab 25 at 250. Mr. Jardon signed DA Form 3947, indicating that he had been informed of the findings and recommendations of the MEB and agreed with them. He did not exercise his right to appeal the MEB's findings. AR Tab 25 at 250.

Mr. Jardon was referred for an informal PEB proceeding, which took place on February 7, 2006. The PEB found that Mr. Jardon had only one unfitting condition: chronic left wrist pain post-ganglion removal in 2002. The PEB found that Mr. Jardon's cubital tunnel syndrome in his left wrist was not separately unfitting from his chronic left wrist pain, because there was no evidence that the neuropathy in his left wrist adversely impacted the performance of his duties. The PEB also found that Mr. Jardon's difficulty sleeping was not medically unfitting. AR Tab 24 at 239. Based on those findings, the PEB concluded that Mr. Jardon was physically unfit for duty due to his chronic left wrist pain, recommended a disability rating of 10 percent, and recommended that he be separated from the Army with severance pay. AR Tab 24 at 239. On March 1, 2006, Mr. Jardon signed DA Form 5893-R, indicating that he had received counseling from a Physical Evaluation Board Liaison Officer ("PEBLO"), who explained to Mr. Jardon the MEB and informal PEB proceedings and findings, as well as Mr. Jardon's rights to further review proceedings. AR Tab 24 at 243-44. Mr. Jardon also signed DA Form 199, stating that he concurred with the findings of the informal PEB proceeding and waived a formal hearing of his case. AR Tab 24 at 240.

Mr. Jardon was discharged from the Army on April 15, 2006, with a disability rating of 10 percent.  He was authorized for disability pay at the E-5 pay grade.  AR Tab 26 at 299.

### iii.    VA Treatment

After his separation from the Army, but before he filed his first claim with the ABCMR or PDBR, Mr. Jardon made benefits claims and sought treatment for his medical conditions with the U.S. Department of Veterans Affairs ("VA").  On November 20, 2007, he was evaluated by the VA and found to have the following conditions: labyrthinthitis, tinnitus, impaired hearing, paralysis of both his left and right median nerves, and limited motion of one of his wrists, presumably his left.  The file also noted that Mr. Jardon was experiencing chronic low back pain and pain in both wrists and elbows.  Mr. Jardon was assigned a 10 percent disability rating for each of four conditions, including labyrthinthitis, tinnitus, and paralysis of the left and right median nerves, for an overall disability rating of 40 percent.  AR Tab 20 at 217.

On December 12, 2007, Mr. Jardon was given a psychological evaluation.  He indicated that on some days nothing bothered him, while on others he was "highly irritable," that he had sleep problems, and that he had "thoughts about Iraq that just pop in his mind," as well as nightmares.  AR Tab 20 at 220.  In January 2008, Mr. Jardon was prescribed medication for "chronic low back pain."

The VA issued a claim decision in response to Mr. Jardon's February 26, 2008 claim for service-connected compensation.  The claim decision stated that Mr. Jardon had received a 30 percent disability rating for PTSD, a 10 percent rating for bilateral hearing loss, a 10 percent rating for vertigo, a 10 percent rating for bilateral tinnitus, a 10 percent rating for cubital tunnel syndrome with ulnar nerve neuralgia for his left upper extremity, and a 10 percent rating for cubital tunnel syndrome with ulnar nerve neuralgia for his right upper extremity, for an overall disability rating of 60 percent.  That decision also indicated that Mr. Jardon's sleep problems and chest pain with rapid heartbeat were determined to be unrelated to his military service.  AR Tab 14 at 162-63.  The February 2008 claim decision was the first VA record that indicated that Mr. Jardon had been diagnosed with PTSD.

On November 21, 2008, Dr. Stacey Lanier reported that Mr. Jardon was suffering from substantial ongoing anxiety, depression, and anger stemming from PTSD due to events in Iraq.  Despite ongoing treatment, he was experiencing daily problems with severe anxiety, depression, safety concerns, irritability, and difficulty not becoming angry, which complicated his ability to maintain employment.  AR Tab 20 at 230

The VA issued a new Rating Decision for Mr. Jardon on April 10, 2009.  The April 10, 2009 Rating Decision found that Mr. Jardon had PTSD that was connected to his military service, for which he was assigned a 30 percent disability rating; bilateral hearing loss that rendered him 10 percent disabled; and vertigo, bilateral tinnitus, and cubital tunnel syndrome with ulnar nerve neuralgia in both the left and right upper extremities, each of which warranted a 10 percent disability rating.  In addition, the Rating Decision stated that Mr. Jardon suffered from low back pain, a respiratory condition, problems sleeping, and chest pain with rapid heartbeat, but that these conditions were not related to his military service.  AR Tab 14 at 167-76.  The VA gave Mr. Jardon an overall combined disability rating of 60 percent.  The April 10, 2009 Rating Decision stated the following, regarding Mr. Jardon's PTSD:

> The examiner's diagnosis is post traumatic stress disorder with major depression.  The examiner noted the diagnoses are related and the secondary diagnosis does represent a progression of the primary diagnosis.  You are unable to separate your symptoms and the beginning of both appears almost simultaneous.  The symptoms of each mental disorder cannot be delineated from each other.

AR Tab 14 at 171.  Mr. Jardon's PTSD diagnosis and increased hearing loss evaluation were given an effective date of February 26, 2008, the date on which the VA received Mr. Jardon's claim for benefits.  The bilateral tinnitus, vertigo, and cubital tunnel syndrome diagnoses were marked effective as of April 16, 2006.  The VA's 60 percent disability rating of Mr. Jardon was in place when both the ABCMR and the PDBR issued decisions in his case.

On November 4, 2009, the day after the PDRB held a hearing in Mr. Jardon's case but before the PDBR issued a decision or the ABCMR issued its second decision, as detailed below, the VA increased

Mr. Jardon's disability rating to 80 percent effective as of July 1, 2009.
AR Tab 14 at 180.

> iv.   ABCMR Proceedings

Over two years after his separation from the Army, in December
2008, Mr. Jardon filed an application with the ABCMR, pursuant to
10 U.S.C. § 1552.  On his ABCMR application, Mr. Jardon indicated that
the "error or injustice in the record to be corrected" was "medical evaluation
findings not accurate due to missing medical documentation."  AR Tab 20
at 188.   In a letter accompanying his application, Mr. Jardon stated that the
MEB had only considered the 2002 nerve study on his left wrist.  He had
undergone further nerve testing in 2006, prior to the MEB proceeding,
which evaluated both his left and right wrists.  However, Mr. Jardon
asserted that the paperwork from the 2006 testing was not included in his
records.  He claimed that the 2006 test demonstrated that he had nerve
damage in both his left and right arms at the time of his separation, but that
the MEB had not considered his right arm condition.  In addition,
Mr. Jardon stated that the MEB did not mention many of his other health
conditions, including vertigo, PTSD, adjustment disorder, anxiety,
depression, and lower back problems.  AR Tab 20 at 190.  Mr. Jardon's
letter to the ABCMR stated that he was not aware that he could re-open his
case until his wife's PEBLO counselor advised him of that possibility in
November 2008.  AR at 190.  In a subsequent letter to the ABCMR, dated
February 13, 2009, Mr. Jardon again told the ABCMR that he was seeking
correction of his disability rating because he was misdiagnosed or not
properly evaluated at the time of his medical evaluation because "most" of
his paperwork was not in his file.  He stated that there was no mention of
many of his "problems or symptoms," including: "1) my right arm nerve
damage, 2) PTSD, 3) Anxiety, 4) Adjustment Disorder, 5) Depression or
other problems in active duty medical sheets that I have supplied to you,
6) Vertigo, 7) Lower back problems."  AR Tab 20 at 190.  Mr. Jardon
indicated that he had sent copies of the missing medical records to the
ABCMR with his application.

In addition to his two letters, Mr. Jardon included with his ABCMR
application medical documents pre-dating his separation, as well as VA
documents showing that Mr. Jardon had been undergoing treatment for
various conditions since his separation in 2006.  Army records showed that
Mr. Jardon was evaluated by a cardiologist on May 4, 2004, for recurring

racing heart symptoms, AR Tab 20 at 198, and that he was seen at a medical facility in Iraq on August 7, 2003, after he complained of difficulty breathing, a fast heart beat, and tightness in his chest on two occasions during his deployment.  AR Tab 20 at 199.  Mr. Jardon's ABCMR file also included the 2006 nerve testing conducted on Mr. Jardon's left and right arms, which Mr. Jardon claims was missing from his MEB and PEB proceedings.  The 2006 study showed that there was "electrodiagnostic evidence of peripheral polyneuropathies involving all distal nerves in the bilateral upper limbs."  AR Tab 20 at 232.  Mr. Jardon was prescribed elbow splints for both his right and left wrists as a result of the testing.

The VA records submitted with Mr. Jardon's ACBMR application addressed his treatment and diagnoses post-dating his separation from the Army in 2006.  A letter from Dr. Stacey Lanier at the VA Medical Center in Houston, Texas, dated November 21, 2008, stated that Mr. Jardon "suffers from substantial ongoing anxiety, depression, and anger – stemming from his Post-Traumatic Stress Disorder, due to events and exposure in Iraq. Despite ongoing treatment, Mr. Jardon has not yet shown the maintained beneficial response we are aiming for, and continues to have daily problems with severe anxiety, depression, and safety concerns."  AR Tab 20 at 230.

On February 4, 2009, the Army Review Boards Agency referred Mr. Jardon's ABCMR application to the Army Physical Disability Agency ("APDA") for an advisory opinion on whether Mr. Jardon's disability rating should be increased.  AR Tab 19 at 187.  The APDA rendered an advisory opinion on February 27, 2009.  The APDA found that Mr. Jardon's complaints of shoulder and back pain and vertigo, which Mr. Jardon claimed were not mentioned by the MEB or PEB, were addressed during his MEB proceeding.

> The shoulder and back pain were infrequent and only resulted in mild discomfort.  The vertigo symptoms were only one time a year before [the MEB] and there was no evidence of any continuing problems or required treatments.  All other complaints not listed on his MEB were properly noted by the examining physician and were found to not substantially affect his functioning so as to require listing as a current condition on the MEB.

AR Tab 17 at 184.

The APDA opinion also addressed the 2006 electrodiagnostic study of Mr. Jardon's left and right arms, which Mr. Jardon claimed was not included in his MEB or PEB proceedings. The APDA stated that the 2006 study "found some abnormal findings suggesting bilateral peripheral polyneuropathies in [Mr. Jardon's] upper extremities." AR Tab 17 at 184. The APDA stated that the results of the 2006 study were "placed in the applicant's health records." However, the APDA acknowledged that Mr. Jardon's MEB file did not contain the 2006 test results. The APDA said it was unclear whether the medical records sent to the PEB included the 2006 test results; thus, it was unclear whether the PEB considered the 2006 test results before assigning Mr. Jardon's disability rating. However, the APDA's advisory opinion stated that the 2006 study did not "relate that the condition did not meet medical retention standards," nor that "the findings should be added to the MEB, or the MEB must be returned for additional consideration." AR Tab 17 at 184. The APDA went on to explain that, pursuant to Department of Defense Instruction ("DoDI") 1332.39, the informal PEB can only assign a disability rating for conditions which the MEB finds unfitting for duty. The APDA stated: "Simply having conditions at the time of the PEB does not justify a finding of unfitness because of physical disability," the opinion explained, citing Army Regulation ("Army Reg.") 635-40, ¶ 3-1 (2012). AR Tab 17 at 185. The APDA opinion stated that, even if the 2006 study had been included in Mr. Jardon's file, the PEB would not have found that the left and right arm conditions identified in the 2006 study were medically unfitting, as there was no evidence that those conditions adversely affected Mr. Jardon's ability to perform his duties at the time of his MEB or PEB proceeding. Finally, the APDA opinion stated that Mr. Jardon provided no evidence of any error in the PEB's findings. Therefore, the APDA concluded that the PEB's findings were supported by the evidence, not arbitrary or capricious, and not in violation of any existing statute or regulation. AR Tab 17 at 185.

On March 4, 2009, Walter Avery, Chief of the Case Management Division of the Army Review Boards Agency, sent Mr. Jardon a letter informing him that APDA had issued an unfavorable advisory opinion in his case. The letter stated that the ABCMR could adopt the APDA's opinion in whole or in part, or reject the APDA's recommendation. The letter indicated that Mr. Jardon's application would be placed on hold for thirty days so that

Mr. Jardon would have the opportunity to submit a rebuttal to the APDA's advisory opinion.  AR Tab 16 at 183.

Mr. Jardon responded to Mr. Avery's letter on March 11, 2009.  It stated: "I have submitted all relevant documentation to satisfy the needs or lack of medical proof that was not submitted while I was going through my medical board proceedings."  Mr. Jardon stated that he was told by several PEBLO officers that he could re-open his case and that it should not be "hard to achieve" a reconsideration of his disability rating.  Mr. Jardon's letter referred to several of the medical conditions which he believed were not considered by the MEB and PEB, including PTSD, chronic back problems, vertigo, problems in his upper extremities, and hearing.  He indicated that he had been receiving treatment at the VA hospital in Houston, Texas, for all of those conditions.  Mr. Jardon stated that he had to wear two arm/wrists braces daily and two elbow braces nightly.  He concluded his letter by stating: "I came out [sic] the service with a few disabilities and should have had more listed but I was told I could fix it later on and it wouldn't be so hard to achieve. I have submitted all I can and I ask for your help . . . ."  AR Tab 15 at 182.

Before the ABCMR issued a decision on his application for correction of his military records, Mr. Jardon filed an application for review of his discharge from the Army with the Army Review Boards Agency on April 8, 2009.  When asked on the application form why an upgrade or change was requested, Mr. Jardon stated: "There was missing medical documentation at the time of deciding the ratings for disability, 1) vertigo, 2) PTSD was just written off as sleep problems, 3) back pains, 4) hearing loss, 5) arms nerve damage."  AR Tab 14 at 129.  Under "Remarks," Mr. Jardon wrote:

> At the time of my MEB I was told by my PEBLO officer that I could refile again once I got out of service and then that was later confirmed by my wife's PEBLO counselor/officer on November this past year.  I was told by Mr. Guzman that my medical files had been sent to Fort Sam Houston in San Antonio, TX, for my evaluation and it was too late for me to send in the latest nerve studies that were done after my file was sent in at the end of 2005.  I was working in the hospital so I didn't get to do many appointments before leaving the service. I took the counselors [sic] advice and now I'm begging to try to

get this correction and reevaluate me with all of my evidence for
all of my claims!

AR Tab 14 at 130.

Mr. Jardon's April 8, 2009 application for review of his discharge was
accompanied by his Army medical records and VA medical records post-
dating his 2006 separation.  Included with the application was a VA claim
decision in response to Mr. Jardon's February 26, 2008 claim for service-
connected compensation.  The VA's claim decision stated that Mr. Jardon
had received a 30 percent disability rating for PTSD, a 10 percent rating for
bilateral hearing loss, a 10 percent rating for vertigo, a 10 percent rating for
bilateral tinnitus, a 10 percent rating for cubital tunnel syndrome with ulnar
nerve neuralgia for his left upper extremity, and a 10 percent rating for
cubital tunnel syndrome with ulnar nerve neuralgia for his right upper
extremity, for an overall disability rating of 60 percent.  AR Tab 14 at
162-63.

The ABCMR responded to Mr. Jardon's December 2008 application
for correction of his military records on April 23, 2009.  The ABCMR stated
that it considered Mr. Jardon's application and supporting documents, his
military personnel records, and any advisory opinions in deciding his claim.
The ABCMR explained that Mr. Jardon was, in effect, requesting a
correction of his MEB and PEB proceedings "to show an accurate and
complete evaluation of all of his medical conditions, along with an increase
in his disability rating."  AR Tab 13 at 118.  The ABCMR also stated that
Mr. Jardon contended that his MEB and PEB proceedings were missing
medical documents that he was told would be included in his file before a
final decision was rendered by the PEB, but were not, in particular, the
2006 electrodiagnostic testing of his left and right arms.  The ABCMR
indicated that Mr. Jardon also objected to the fact that there was no
mention in the MEB and PEB proceedings of his right arm nerve damage
and vertigo.  Finally, the ABCMR stated that Mr. Jardon claimed that he
was being treated by the VA for PTSD, adjustment disorder, anxiety,
depression, and lower back problems, and those conditions were not
included in the MEB or PEB, despite evidence that Mr. Jardon was
experiencing those conditions at the time that he was an active duty
soldier.  AR Tab 13 at 118-19.

The ABCMR's April 23, 2009 decision went through the evidence submitted by Mr. Jardon.  In addition, the ABCMR decision referred to the APDA's advisory opinion on Mr. Jardon's claim.  The ABCMR noted that the APDA concluded that Mr. Jardon had "provided no evidence of any error in the PEB's findings," and that the PEB's findings "were supported by a preponderance of the evidence and were not arbitrary or capricious," nor "in violation of any statute, directive, or regulation in existence at the time of the applicant's separation."  AR Tab 13 at 123.

The ABCMR explained that, pursuant to Army Reg. 635-40, the Army rates only conditions determined to be physically unfitting, and which were incurred or aggravated during the period of service.  The Army can rate a condition only to the extent that the condition limits the soldier's performance of duty, the ABCMR stated.  The VA, on the other hand, "awards disability ratings to veterans for conditions that it determines were incurred during military service and subsequently affect the individual's civilian employability."  Thus, it is not unusual for the same individual to obtain very different disability ratings from the Army and the VA.  The ABCMR indicated that a higher VA rating does not indicate any error on the part of the Army.  Moreover, the ABCMR stated that it applies a presumption of administrative regularity in its review process; therefore, the applicant has the burden of proving an error or injustice by a preponderance of the evidence.  AR Tab 13 at 125-26.

In Mr. Jardon's case, the ABCMR found no evidence to show "that the Army misapplied either the medical factors involved or the governing regulatory guidance concerning the applicant's disability processing."  AR Tab 13 at 127.  The ABCMR stated that there was "no basis for consideration of any additional disability rating" in Mr. Jardon's case.  Therefore, the ABCMR decided, Mr. Jardon was not entitled to correction of his records.  AR Tab 13 at 127.  On April 27, 2009, the ABCMR issued a Memorandum to the Army Review Boards Agency stating that Mr. Jardon's application for correction of his military records was denied.  AR Tab 12 at 117.

The ABCMR treated Mr. Jardon's April 8, 2009 application for review of his discharge from the Armed Forces as a request for reconsideration of the ABCMR's April 23, 2009 denial of his initial application.  The ABCMR issued a second decision on February 18, 2009.  The ABCMR detailed the new evidence and new arguments that Mr. Jardon had put forth.  The

ABCMR noted that medical documents provided by Mr. Jardon showed that he was treated at an emergency room for vertigo in January 2005, but said there was no evidence that Mr. Jardon had ever been diagnosed with vertigo, or that he "was unable to perform his duties due to vertigo, PTSD, back pains, or hearing loss at the time of his MEB on 16 December 2005." AR Tab 3 at 9.  The ABCMR concluded again that "there is no evidence to show that the applicant's disability was improperly rated by the PEB or [sic] failed to properly consider any other conditions or that his separation without severance pay was not in compliance with law and regulation." AR Tab 3 at 9.  The ABCMR acknowledged that the VA was treating Mr. Jardon for PTSD with major depression, bilateral hearing gloss, vertigo, bilateral tinnitus, cubital tunnel syndrome with left upper extremity ulnar nerve neuralgia, and cubital tunnel syndrome with right upper extremity ulnar neuralgia.  However, the ABCMR stated that the VA's actions in Mr. Jardon's case "d[id] not necessarily demonstrate an error or injustice on the part of the Army."  AR Tab 3 at 9.  For those reasons, the ABCMR again denied Mr. Jardon's request for relief, AR Tab 2 at 2, and notified Mr. Jardon of the denial on February 19, 2010.  AR Tab 1 at 1.

> v.     PDBR Proceedings

Mr. Jardon applied to the PDBR for a review of his disability rating on May 13, 2009, and re-filed his application on July 27, 2009.  He stated on DA Form 294 that he was seeking a change of his disability rating because there had been "no mention of paperwork that was submitted on December 16, 2005."  AR Tab 10 at 62.  Mr. Jardon included with his application to the PDBR various Army medical records, including the 2006 electrodiagnostic study of his left and right arms, which he claimed was not included in the MEB and PEB proceedings, as well as VA medical records. In particular, Mr. Jardon included a copy of the VA's April 10, 2009 Rating Decision, which raised his overall VA disability rating from 60 percent to 80 percent.  AR Tab 10 at 70-79.

On July 31, 2009, Mr. Jardon wrote a letter to the PDBR protesting the PDBR's decision that it could not review all of Mr. Jardon's medical conditions.  Mr. Jardon stated that, pursuant to 10 U.S.C. § 1554a, he was entitled to have all of the decisions of the PEB reviewed using his entire military record.  In addition, Mr. Jardon claimed that his MEB did not meet the standards set out in DoDI 1332.38, which requires the MEB to document full clinical information on all medical conditions the service

16

member has and state whether each is a cause for referral into the DES.
The MEB failed to list all of his medical conditions and state their status for
referral to the DES, according to Mr. Jardon, yet, the PEB erroneously
determined that the MEB record was complete.  Mr. Jardon stated:

> Clearly my unfitness was not due solely to my left wrist
> condition.  Rather it was due to the overall effect of my painful
> left and right wrists, PTSD, depression, vertigo, auditory
> problems and either conditions that were properly identified and
> evaluated by the VA resulting in a combined disability rating of
> 60%.  Had the MEB, and PEB done their jobs correctly, my
> numerous medical conditions would have been properly
> assessed as either independently unfitting or contributing to
> unfitting making my military disability rating much higher than
> 10%.

AR Tab 8 at 25.  Mr. Jardon alleged that the PDBR was now "further
exacerbating the problem" by deciding that it could only review conditions
in Mr. Jardon's DES record.  AR Tab 8 at 25.  Mr. Jardon asserted that the
PDBR was required by law to "consider all of the evidence of the record to
include the information I sent in with my application."  AR Tab 8 at 25.

The PDBR held a hearing in Mr. Jardon's case on November 3, 2009,
and issued a decision on November 10, 2009.  The PDBR's decision
includes a side-by-side comparison of the PEB's and VA's respective
disability ratings for Mr. Jardon.  AR Tab 7 at 15.  The PDBR went through
each of Mr. Jardon's claimed conditions one by one.  The PDBR agreed
that Mr. Jardon's chronic left wrist pain condition rose to the level of
medically unfitting and was properly assigned a 10 percent disability rating
by the PEB.  AR Tab 7 at 17-18.  With regards to his left cubital tunnel
syndrome, the PDBR found that the PEB specifically evaluated this
condition and found it not unfitting because "[t]here was no evidence of any
functional impairment relating to this diagnosis in the record and this
condition did not rise to the level of unfitting for duty (sic)."  AR Tab 7 at 18.
Therefore, the PDRB agreed with the PEB that Mr. Jardon's left cubital
tunnel syndrome was not separately unfitting.

Regarding Mr. Jardon's right cubital tunnel syndrome, the PDBR
found that, while right shoulder problems had been noted in Mr. Jardon's
PEB file, "right wrist, hand or arm conditions are not otherwise mentioned in

17

the PEB file." AR Tab 7 at 18. The PDBR stated that the 2006 electrodiagnostic study of Mr. Jardon's left and right arms was included in Mr. Jardon's service medical records, which were provided to the PEB, and should have been considered by the PEB. However, Mr. Jardon's "DES file did not contain any abnormalities of the right upper extremity except for right shoulder pain." AR Tab 7 at 19. Moreover, the PDBR found, "there was no evidence of any functional impairment relating to this diagnosis or any right upper extremity disability or duty limitation in the record." AR Tab 7 at 19. The PDBR concluded that, because the right arm condition "was not addressed in the DES file, it is outside the scope of the Board to adjudicate." Thus, the PDBR could not raise Mr. Jardon's disability rating based on the right arm condition. AR Tab 7 at 19.

With regard to difficulty sleeping, PTSD, and depression, the PDBR concluded that there was no evidence in the record that those conditions adversely impacted Mr. Jardon's performance of his duties or should have led to separation. The PDBR noted that Mr. Jardon was not diagnosed with PTSD and depression until March 2008, two years after his separation from the Army, and that there was no evidence in the record of a missed diagnosis at the time of his separation. AR Tab 7 at 20. Finally, the PDBR stated that Mr. Jardon's records did include discussion of chest pain with rapid heartbeat, breathing problems, low back pain, right shoulder pain, vertigo, and bilateral tinnitus, but there was no evidence that any of those conditions adversely impacted the performance of Mr. Jardon's duties. Therefore, Mr. Jardon's disability rating could not be raised based on difficulty sleeping, PTSD, or depression.

"After careful consideration of all available information," the PDBR concluded that Mr. Jardon's disability was properly rated at 10 percent. AR Tab 7 at 22. Therefore, the PDBR concluded that no re-characterization of Mr. Jardon's disability rating and separation determination was warranted. The PDBR reported its proceeding and recommendation to the Deputy Assistant Secretary of the Army, AR Tab 6 at 13, who accepted the decision and denied Mr. Jardon's application on November 18, 2009. AR Tab 5 at 12. Mr. Jardon was notified that his recourse within the Department of Defense and Department of the Army were exhausted, but that he could seek judicial review of his claim. AR Tab 4 at 11.

C.    Plaintiff's Claims

Mr. Jardon's claims center around his argument that documents were missing from his medical records at the time of his MEB and PEB proceedings, particularly the 2006 nerve testing of his left and right arms. Thus, Mr. Jardon claims, material evidence was not evaluated by the MEB and PEB when the boards rendered their decisions regarding his fitness for duty and disability rating in 2006.  Plaintiff's Cross-Motion for Judgment on the Administrative Record ("Pl's. Cross-Mot.") at 3.  Mr. Jardon argues that applicable statues and regulations required the MEB and PEB to consider the full clinical information regarding his conditions.  Because material records were absent from his MEB and PEB proceedings, Mr. Jardon claims the decisions of the ABCMR and PDBR denying correction of his military records and reconsideration of his disability rating were arbitrary, capricious, and contrary to law in the following respects:

- The ABCMR failed to consider all of Mr. Jardon's medical conditions, as well as their overall effect; thus it failed to document the full clinical information regarding all of Mr. Jardon's conditions.
- The ABCMR did not properly apply Army regulations in reconciling the disability ratings given to Mr. Jardon by the Army and the VA, respectively.
- The PDBR failed to review all of Mr. Jardon's medical records, instead limiting itself to what it defined as Mr. Jardon's "DES Submission."
- The PDBR failed to consider all of Mr. Jardon's medical conditions, as well as their overall effect.
- The PDBR unjustifiably relied on the APDA's advisory opinion.
- Both the ABCMR and the PDBR acted arbitrarily in determining that the Army was justified in not rating Mr. Jardon's PTSD in 2006.

Mr. Jardon claims that he should have been assigned at least a 30 percent disability rating, which would have qualified him for disability retirement, instead of separation.  Mr. Jardon requests that the court overrule the correction boards' decisions and remand his case for "the full and complete review that is required by applicable Federal law and Army regulations."  Pl's. Resp. at 2.  The parties have filed Cross-Motions for Judgment on the Administrative Record.

D.     Discussion

i.     Legal Standard

In reviewing a Motion for Judgment upon the Administrative Record pursuant to Rule 52.1 of the Rules of the U.S. Court of Federal Claims (RCFC), "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based upon the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005)).  The existence of a question of fact does not preclude the granting of a motion for judgment on the administrative record.  *See Verbeck v. United States*, 97 Fed. Cl. 443, 450 (Fed. Cl. 2011).  Instead, the court resolves factual questions by reference to the administrative record.  *See id.* (citing *Bannum*, 404 F.3d at 1356-57).

The court reviews the decisions of a military correction board "to determine whether it is arbitrary, capricious, unsupported by substantial evidence, or contrary to law."  *Lewis v. United States,* 458 F.3d 1372, 1376 (Fed. Cir. 2006) (citing *Martinez v. United States*, 333 F.3d 1295, 1305, 1314 (Fed. Cir. 2003), *cert. denied*, 540 U.S. 1177 (2004), *reh'g en banc denied* (2006), *cert. denied*, 552 U.S. 810 (2007)); *see also Chappell v. Wallace,* 462 U.S. 296, 303 (1983) ("Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious or not based on substantial evidence."); *Porter v. United States,* 163 F.3d 1304, 1312 (Fed.Cir.1998), *reh'g denied*, *en banc suggestion declined* (Fed. Cir. 1999), *cert. denied*, 528 U.S. 809 (1999); *Armstrong v. United States,* 205 Ct. Cl. 754, 761 (1974)).  The court does not serve as a "super correction board." *Van Cleave v. United States*, 70 Fed. Cl. 674, 678 (2006) (quoting *Skinner v. United States,* 594 F.2d 824, 827, 219 Ct. Cl. 322, 327 (1979)).  Rather, it affords the correction board's decision "substantial deference."  *Id.* (citing *Pope v. United States*, 16 Cl. Ct. 637, 641 (1989)).  Moreover, "military administrators are presumed to act lawfully and in good faith like other public officers and the military is entitled to substantial deference in the governance of its affairs."  *Dodson v. United States*, 988 F.2d 1199, 1204 (Fed. Cir.), *reh'g denied* (Fed. Cir. 1993).

Under this standard of review, the court considers whether the military correction board's decision "was based on a consideration of the

relevant factors and whether there has been a clear error of judgment."
*Verbeck*, 97 Fed. Cl. at 451 (quoting *Citizens to Preserve Overton Park,
Inc. v. Volpe,* 401 U.S. 402, 416, (1971), *abrogated on other grounds*,
*Califano v. Sanders,* 430 U.S. 99, 104–05 (1977)).  The board's decision
will stand so long as a "'reasonable mind might accept' [the] particular
evidentiary record as 'adequate to support [the contested] conclusion.'"
*Dickinson v. Zurko,* 527 U.S. 150, 162 (1999) (quoting *Consolidated Edison
Co. of N.Y. v. NLRB,* 305 U.S. 197, 229 (1938)).  The U.S. Court of Federal
Claims has specifically held that fitness of duty decisions are the type of
issue which the court should not second guess lightly.  *See  Cole v.
United States*, 52 Fed. Cl. 429, 431 (2002) (quoting *Maier v. Orr*, 754 F.2d
973, 984 (Fed. Cir. 1985) ("[j]udicial deference to administration decisions
of fitness for duty of service members is and of right should be the norm.")).

However, the court has a role in ensuring that correction boards
"examine relevant data and articulate satisfactory explanations for their
decisions."  *Van Cleave*, 70 Fed. Cl. at 679 (citing *Yagjian v. Marsh,*
571 F.Supp. 698, 701 (D.N.H.1983) (citing *Motor Vehicle Mfrs. Ass'n of the
U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, (1983))).
Correction boards must make "rational connections between the facts
found and the choices made."  *Van Cleave*, 70 Fed. Cl. at 679.  The court
will find a correction board's decision arbitrary and capricious "if the board
fails to consider an important aspect of a problem, offers an explanation for
its decision that runs counter to the evidence before the board, or 'is so
implausible that it could not be ascribed to a difference in view or the
product of [board] expertise.'"  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n,*
463 U.S. at 43).

> ii.      Waiver of Judicial Review of the MEB and PEB Decisions

Mr. Jardon's claims all center on the argument that significant and
material documentation regarding his medical conditions was not evaluated
by the MEB and PEB.  Pl's. Cross Mot. at 4.  Defendant argues that judicial
review of the MEB's and PEB's determinations in this case are precluded
because Mr. Jardon did not object to or appeal those decisions at the time
they were made.  Defendant's Motion for Judgment on the Administrative
Record ("Def's. Mot.") at 19.  Defendant relies on *Gant v. United States*, in
which a member of the Navy voluntarily waived his right to appeal the
informal PEB's decision in his case, but then filed suit in this court
challenging the PEB's findings.  *Gant v. United States*, 63 Fed. Cl. 311, 318

(2004), *aff'd*, 417 F.3d 1328 (Fed. Cir. 2005). In *Gant*, the court noted that it is well-established that an agency must have the first opportunity to respond to a plaintiff's claims. *Id.* Reasoning that "allowing a plaintiff to maintain a claim after waiving it earlier would render the waiver meaningless," the court found that the plaintiff's waiver precluded judicial review of the PEB's decision. *Id.* at 318-19 (citing *Maier v. Orr*, 745 F.2d 973 (Fed. Cir. 1985); *McHenry v. United States*, 367 F.3d 1370, 1377 (Fed. Cir. 2004)). Defendant asserts that Mr. Jardon voluntarily waived his right to review of the MEB's and PEB's decisions and, thus, judicial review of those determinations are barred. Def.'s Mot. at 21-24.

Plaintiff responds that he is not seeking review of the MEB's or PEB's decisions, but instead of the ABCMR's and PDBR's decisions. Pl's Cross-Mot. at 14. Mr. Jardon asserts that his case is analogous to *Rominger v. United States* and *Van Cleave v. United States*, in which he says, this court held that a service member who had accepted an informal PEB determination waived his right to review of the PEB decision, but did not waive his right to judicial review of a correction board's decision regarding his disability status. Pl's Cross-Mot. at 15 (citing *Rominger v. United States*, 72 Fed. Cl. 268, 272-73 (2006); *Van Cleave v. United States*, 66 Fed. Cl. 133, 136 (2005)). Thus, Mr. Jardon argues, waiving the right to judicial review of the MEB's and PEB's determinations in his case does not bear on his ability to seek judicial review of the ABCMR's and PDBR's decisions. Pl's Cross-Mot. at 16.

Army Regulation 635-40 sets forth the Army's policies and procedures "that apply in determining whether a Soldier is unfit for duty because of physical duty." Army Reg. 635-40, ¶ 1-1. It provides that, if the MEB determines that a soldier does not meet the Army's retention standards, it refers the soldier to the PEB. *Id.* at ¶ 4-10. Each case is referred first to an informal PEB. *Id.* at ¶ 4-20a. The informal PEB determines whether the soldier is physically fit for duty and, if unfit, rates the soldier's disability. *Id.* at ¶¶ 4-19d(2), 4-19i. The informal PEB must make a written record of its findings or recommendations on DA Form 199. The soldier is given 10 days to review the findings and recommendations and consult with a PEBLO, who is tasked with counseling the soldier about the results of their PEB and the available appeals process. *Id.* at ¶¶ 4-20c, 4-20d. The soldier may then elect to concur, nonconcur but waive a formal hearing and appeal in writing, or nonconcur and demand a formal hearing. *Id.* at ¶ 4-20c. If the soldier concurs, as Mr. Jardon did, the case is

forwarded to the Secretary of the Army for final disposition. *Id.* at
¶ 4-20e(1).

After the MEB rendered a decision in his case, Mr. Jardon consulted
with a PEBLO and signed form DA Form 3947.  The form reads: "I have
been informed of the approved findings and recommendations of the
board."  Mr. Jardon checked the box indicating that he "agree[d] with the
board's findings and recommendations."  Similarly, after the PEB issued its
decision and Mr. Jardon was given the opportunity to consult with a
PEBLO, Mr. Jardon signed DA Form 199.  It reads: "I have been advised of
the findings and recommendations of the Physical Evaluation Board, and
have received a full explanation of the results of the finding and
recommendation and legal rights pertaining thereto."  Mr. Jardon initialed
next to the statement: "I concur and waive a formal hearing of my case."
AR Tab 26 at 299.

Defendant is correct that, by signing DA Forms 3947 and 199,
Mr. Jardon voluntarily waived his right to review of the MEB's and PEB's
decisions.  *See Gant*, 63 Fed. Cl. at 318-19.  However, Mr. Jardon is
correct that waiver of a formal PEB does not waive his right to seek judicial
review of the ABCMR and PDBR decisions in his case.  *See Van Cleave,*
66 Fed. Cl. at 136 (holding that a service member who had accepted an
informal PEB determination had waived his right to seek review of the PEB
decision, but had not waived his right to judicial review of a correction
board decision not to change the service member's disability status); *see
also Rominger v. United States*, 72 Fed. Cl. at 272-73 (agreeing with the
*Van Cleave* court and finding that the plaintiff was entitled to judicial review
of the ABCMR decision in his case despite having waived a formal PEB).

Thus, the only determinations made by the Army in Mr. Jardon's case
which are properly before this Court are those of the ABCMR and the
PDBR.  The court's review "is limited to the Correction Board[s'] denial of
[Mr. Jardon]'s application for review on the basis of the record before it."
*See Van Cleave*, 66 Fed. Cl. at 136.  The court cannot review the
underlying decisions of the MEB and PEB.  *See id.*  Therefore, while the
gravamen of Mr. Jardon's argument is that the underlying decisions of the
MEB and PEB were in error and the correction boards failed to correct
those errors, the court can only address whether the decisions of the
ABCMR and PDBR were arbitrary, capricious, or contrary to law.

### iii.   ABCMR's and PDRB's Consideration of All of Mr. Jardon's Conditions and Their Overall Effect

Mr. Jardon argues that the ABCMR's and PDBR's decisions were arbitrary, capricious, unsupported by substantial evidence, and contrary to law because they ignored the requirements of DoDI 1332.38, which proscribes procedures for separating or medically retiring soldiers because of physical disability.  Pl's Cross-Mot. at 18, 30.  Mr. Jardon specifically references section E3.P1.2.3, which states:

> E3.P1.2.3. Content. MEBs, TDRL physical examinations, and Reserve component physical examinations shall document the **full clinical information of all medical conditions** the Service member has and state whether each condition is cause for referral into the DES. (See enclosure 4 of this Instruction.) Clinical information shall include a medical history, appropriate physical examination, medical tests and their results, medical and surgical consultations as necessary or indicated, diagnoses, treatment, and prognosis. MEBs shall not state a conclusion of unfitness because of physical disability, assignment of disability percentage rating, or the appropriate disposition under Chapter 61 of 10 U.S.C. (reference (b)).

DoDI 133.38 ¶ E3.P1.2.3. (2006) (emphasis added).  Mr. Jardon argues that this provision establishes that his MEB was required to consider all of his medical conditions, but it did not.  Pl's Cross-Mot. at 30.  The MEB's failure to address all of his conditions was a central issue in his appeals to both the ABCMR and PDBR, Mr. Jardon claims.  By failing to correct the MEB's mistakes, the correction boards ignored the requirements of DoDI 1332.38 and, therefore, their decisions were contrary to established law. *Id.*

Similarly, Mr. Jardon argues that under DoDI 1332.38, the PEB was required to consider the overall effect of all of his conditions on his fitness for duty.  He points to the following language:

> E3.P3.4.4. Overall Effect. A member may be determined unfit as a result of the overall effect of two or more impairments even though each of them, standing alone, would not cause the

24

member to be referred into the DES or be found unfit because
of physical disability.

DoDI 1332.38 at ¶ E3.P3.4.4. Mr. Jardon argues that even if the MEB fails
to properly include all conditions, the PEB is required to correct that
mistake and consider the overall effect of all conditions on the soldier's
fitness. Pl's. Cross-Mot. at 31. Mr. Jardon alleges that the ABCMR's and
PDBR's decisions are contrary to law because they fail to mention and
enforce the requirements laid out in DoDI 1332.38. *Id.*

Defendant argues that the ABCMR considered all of the evidence
that Mr. Jardon submitted, as well as each of the arguments he raised
before the ABCMR. Def's. Mot. at 28 (citing AR Tab 3 at 3-10, Tab 13 at
118-28). According to defendant, the ABCMR's two decisions in
Mr. Jardon's case were both based on substantial evidence. Def's. Mot.
at 28-29. The ABCMR determined that there was no evidence that the
medical conditions asserted by Mr. Jardon affected his duty performance
and, thus, could have been rated by the PEB. *Id.* at 29. Likewise,
defendant maintains that the PDBR considered all documentary evidence
submitted by Mr. Jardon, assessed all of the medical conditions he raised,
compared his disability ratings from the Army and the VA, but concluded
that there was no basis for re-characterizing Mr. Jardon's disability rating.
*See id.* at 31-32. Defendant maintains that, even if the MEB and PEB did
not consider or properly document all of Mr. Jardon's conditions, the
correction boards have now considered all of the evidence and all of
Mr. Jardon's asserted conditions. Defendant's Reply to Plaintiff's
Response to Defendant's Motion for Judgment on the Administrative
Record ("Def's. Reply") at 13. "After a full consideration of all evidence and
all claimed medical conditions, the correction boards reasonably found that
Mr. Jardon's disabilities were properly rated," defendant claims. *Id.*

a.    DoDI 1332.38 Does not Apply to the ABCMR or PDBR

Mr. Jardon's arguments regarding DoDI 1332.38 fail because that
provision does not apply to the ABCMR or the PDBR. It applies to the
Army's Disability Evaluation System (DES), which consists of four
elements: MEBs, PEBs, service member counseling, and final disposition
by personnel authorities. DoDI 1332.38. at ¶ E3.P1.1.

The ABCMR is not encompassed within the DES, but rather sits to consider appeals for correction of military records based on a number of issues, not just physical disability.  The ABCMR, therefore, does not operate under DoDI 1332.38.  Instead, 32 C.F.R. § 581.3 governs the ABCMR's procedures.  It states that the ABCMR will "[r]eview all applications that are properly before [it] to determine the existence of error or injustice." 32 C.F.R. § 581.3(b)(4)(i-iii) (2013).  The ABCMR "is not an investigative body;"  it "decide[s] cases on the evidence of record."  *Id.* § 581.3(c)(2)(iii).  In addition, "[t]he ABCMR begins its consideration of each case with the presumption of administrative regularity. The applicant has the burden of proving an error or injustice by a preponderance of the evidence."  *Id.* § 581.3(e)(2).

The PDBR, likewise, is not part of the DES.  It was established as an additional branch of the Army Review Boards Agency in 2008 and operates under DoDI 6040.44.  *See* 10 U.S.C. § 1554a (2012).  The PDBR's mandate is to review the disability ratings of service members who were discharged with a disability rating of 20 percent or less and recommend a change where discrepancies or errors exist.  DoDI 6040.44 at Encl. 3, ¶1 (2009).  The PDBR "review[s] the complete case record that served as the basis for the Military Department PEB rating determination and, to the extent feasible, collect[s] all the information necessary for competent review and recommendation."  *Id.* at Encl. 3, ¶5(d).

Because neither the ABCMR nor the PDBR are part of the DES, but rather each operates under a separate set of regulations, Mr. Jardon's argument that the ABCMR and PDBR did not comply with DoDI 1332.28 does not establish that the correction boards' decisions were arbitrary, capricious, or contrary to applicable law.

> b.    The ABCMR and PDBR Considered and Rejected Mr.
>        Jardon's Argument that the MEB and PEB Decisions Should
>        Have Included All of His Medical Conditions and Their
>        Overall Effect

While neither the ABCMR nor the PDBR is bound by DoDI 1332.38, both boards considered and rejected Mr. Jardon's argument that the MEB and PEB proceedings in his case failed to comply with DoDI 1332.38.  Mr. Jardon raised before both correction boards the argument that his MEB and PEB proceedings should have been corrected to include consideration

of all of his medical conditions and their overall effect.  He stated in his
original ABCMR application, as well as a letter accompanying that
application, that his MEB and PEB proceedings were missing medical
documents that should have been included in his record, in particular the
2006 study of his left and right arms.  AR Tab 20 at 188, 190.  Mr. Jardon's
letter to the ABCMR also specifically argued that his vertigo, PTSD,
adjustment disorder, anxiety, depression, and lower back problems were
not mentioned in his MEB or PEB proceedings or findings, but should have
been.  AR Tab 20 at 190.  Mr. Jardon repeated the same arguments in the
February 13, 2009 letter to the ABCMR.  He again requested that the
ABCMR correct his disability rating because "most" of his medical records
were not in his file when it was presented to the MEB and PEB, and
because there was no mention in the MEB and PEB decisions of many of
his "problems or symptoms," including: "1) my right arm nerve damage,
2) PTSD, 3) Anxiety, 4) Adjustment Disorder, 5) Depression or other
problems in active duty medical sheets that I have supplied to you,
6) Vertigo, 7) Lower back problems."  AR Tab 20 at 190.

        Likewise, Mr. Jardon stated on his PDBR application that his disability
rating should be changed because the MEB and PEB did not include all of
his conditions.  In a letter to the PDBR, sent July 31, 2009, Mr. Jardon
stated: "[m]y MEB clearly did not complete my evaluation per the standard
of DoDI 1332.38."  AR Tab 8 at 24.  He continued, saying that the "PEB
facilitated this problem by erroneously determining that my MEB was
complete."  AR Tab 8 at 25.  Mr. Jardon stated:

        Clearly my unfitness was not due solely to my left wrist
        condition.  Rather it was due to the overall effect of my painful
        left and right wrists, PTSD, depression, vertigo, auditory
        problems and either conditions that were properly identified and
        evaluated by the VA resulting in a combined disability rating of
        60%.  Had the MEB, and PEB done their jobs correctly, my
        numerous medical conditions would have been properly
        assessed as either independently unfitting or contributing to
        unfitting making my military disability rating much higher than
        10%.

AR Tab 8 at 25.  Thus, Mr. Jardon clearly laid out in his application to the
PDBR and supporting documents the argument that his MEB and PEB

proceedings failed to comply with DoDI 1332.38 and that the PDBR should grant him relief on that basis.

Finally, Mr. Jardon's April 8, 2009 application for review of his discharge from the Army, which the ABCMR treated as a request for reconsideration, made the same argument – that his MEB and PEB proceedings were inaccurate due to missing documents and failed to consider vertigo, PTSD, back pains, hearing loss, and nerve damage in his arms.  AR Tab 14 at 1299-130.

Both the ABCMR and PDBR rejected this argument based on the full evidentiary record in Mr. Jardon's case.  Mr. Jardon was given the opportunity to present any documentation that he wished to the ABCMR and PDBR.  He presented to the ABCMR his military medical records, two self-authored statements, records of the MEB and PEB proceedings, numerous VA medical records, and the 2006 electrodiagnostic study of his left and right arms.  In addition, Mr. Jardon provided further documentation with his April 8, 2009 application for review of his discharge, including additional military medical records that pre-dated his MEB and PEB, additional VA records from 2007 onward, and another self-authored statement.  Finally, Mr. Jardon presented extensive records to the PDBR, including the 2006 electrodiagnostic study and his VA records.  Mr. Jardon has not presented any new documentation to this court that was not before the ABCMR and the PDBR.

The ABCMR explained in its April 2009 decision that under Army Reg. 635-40, the Army only rates conditions that are determined to be physically unfitting and only to the extent that the condition limits performance of duty.  AR Tab 13 at 123 (citing Army Reg. 635-40 at ¶ 3-1 ("The mere presence of an impairment does not, of itself, justify a finding of unfitness because of physical disability. In each case, it is necessary to compare the nature and degree of physical disability present with the requirements of the duties the soldier reasonably may be expected to perform because of their office, grade, rank, or rating.")).  The ABCMR's decision referenced the APDA's advisory opinion, which acknowledged that the 2006 electrodiagnostic study of Mr. Jardon's left and right arms was missing from his file at the time of his MEB proceeding.  However, the APDA advisory opinion noted that the 2006 study did not state that the left and right arm conditions identified rendered Mr. Jardon unfit for duty. AR Tab 13 at 123 (citing AR Tab 17 at 184).  In fact, the APDA opinion

stated, even if those condition had been listed on Mr. Jardon's MEB findings, they would not have been found unfitting because there was no evidence that they impaired Mr. Jardon's ability to perform his duties.  The APDA concluded that the PEB's findings in Mr. Jardon's case were supported by a preponderance of the evidence and were not arbitrary or capricious.  AR Tab 13 at 123 (citing AR Tab 17 at 185).  Mr. Jardon filed a written rebuttal to the APDA's advisory opinion, which the ABCMR also took into consideration.  AR Tab 17 at 123.  However, the ABCMR still concluded that there was no evidence in Mr. Jardon's application "to show that the Army misapplied either the medical factors involved or the governing regulatory guidance concerning the applicant's disability processing."  Thus, there was no basis for raising his disability rating above 10 percent.  AR Tab 13 at 127.

The ABCMR's second opinion in Mr. Jardon's case, dated February 18, 2010, concluded that while he was treated for vertigo in August 2005, he had not been diagnosed with, nor found unable to perform his duties due to vertigo, PTSD, back pains, or hearing loss at the time of his MEB in December 2005.  Therefore, there was nothing in his record demonstrating that the PEB improperly rated or failed to consider any additional conditions.  Thus, after reviewing Mr. Jardon's full case file, the ABCMR decided unanimously for a second time that there was no error in his MEB and PEB proceedings.  AR Tab 3 at 9.

The PDBR went through each of Mr. Jardon's alleged conditions one by one.  The PDBR agreed with the PEB's findings that Mr. Jardon's chronic left wrist pain was unfitting and warranted a ten percent disability rating, as well as with the PEB's conclusion that Mr. Jardon's left cubital tunnel syndrome was not separately unfitting.  With regard to right cubital tunnel syndrome, the PDBR noted that nothing about right wrist pain was mentioned in Mr. Jardon's MEB or PEB file.  Prior to the MEB and PEB, Mr. Jardon had only made reference to experiencing pain and popping in his right shoulder.  The PDBR acknowledged that the 2006 electrodiagnostic study of Mr. Jardon's left and right arms should have been considered by the PEB.  However, the PDBR said that its review was limited to Mr. Jardon's DES file and the DES package did not mention any right forearm or wrist complaints.  Therefore, the PDBR could not raise Mr. Jardon's disability rating based on a right arm condition.  AR Tab 20 at 17-19.

Next, regarding Mr. Jardon's difficulty sleeping, the PDBR referenced findings by the MEB, PEB, and ABCMR, all of which found that the condition was not unfitting.  It concluded that there was no evidence that difficulty sleeping adversely impacted Mr. Jardon's duties.  The PDBR assessed Mr. Jardon's mental health conditions collectively, relying on the 2005 psychiatric evaluation by Dr. Phillips, which found that Mr. Jardon had no mental health conditions that warranted inclusion in his MEB.  AR Tab 7 at 20 (citing AR Tab 25 at 256).  The fact that the VA diagnosed Mr. Jardon with PTSD and depression in 2008 – two years after his separation – did not indicate that the Army had missed such a diagnosis in 2006, the PDBR concluded.  At the time of his separation, the PDRB stated, there was no evidence that Mr. Jardon suffered from a mental health condition that adversely impacted his performance of duties.  AR Tab 7 at 20.

Finally, the PDBR decision addressed Mr. Jardon's chest pain with rapid heartbeat, breathing problems, low back pain, right shoulder pain, vertigo, and tinnitus, and concluded that each of these conditions was addressed by the MEB.  The PDBR quoted the following excerpt from the APDA's advisory opinion:

> The shoulder and back pain were infrequent and only resulted in mild discomfort.  The vertigo symptoms were only one time a year before and there was no evidence of continuing problems or required treatments.  All other complaints not listed on [Mr. Jardon's] MEB were properly noted by the examining physician and were found to not substantially affect his functioning so as to require listing as a current condition on his MEB.

AR Tab 7 at 21 (citing AR Tab 17 at 184).  The PDBR acknowledged that the VA rated Mr. Jardon's tinnitus and vertigo at 10 percent.  But, it concluded that there was no evidence that any of those conditions were unfitting at the time of Mr. Jardon's separation from duty.  AR Tab 7 at 22.

Both the ABCMR and PDBR carefully considered the full evidentiary record in Mr. Jardon's case and found that he failed to demonstrate that the MEB and PEB decisions in his case were in error.  Mr. Jardon now argues that the correction boards' refusals to correct the underlying conclusions of the MEB and PEB were arbitrary and capricious.  However, both the ABCMR and PDBR examined the evidence before them and articulated the

reasoning behind the MEB's and PEB's determinations, as well as the reasoning behind their own findings and conclusions.  *See Van Cleave*, 70 Fed. Cl. at 679 (citing *Yagjian*, 571 F.Supp. at 701 (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.,* 463 U.S. at 43) (the correction boards must "examine relevant data and articulate satisfactory explanations for their decisions.").  As noted above, the court affords military correction boards' decision "substantial deference."  *Van Cleave*, 70 Fed Cl. at 678 (citing *Pope*, 16 Cl. Ct. at 641).  Mr. Jardon has failed to point out any deficiency in the ABCMR's and PDBR's reasoning with regard to his medical conditions and their overall effect that would rise to the level of arbitrary, capricious, unsupported by substantial evidence, or contrary to law.  In other words, he has not identified "a clear error of judgment" on the part of the ABCMR or the PDBR that would justify intervention on the part of this court. *See Verbeck*, 97 Fed. Cl. at 451 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 416) (the court shall consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.").

Ultimately, Mr. Jardon's argument that the ABCMR's and PDBR's decisions in his case were arbitrary, capricious, unsupported by substantial evidence, and contrary to law because they ignored the requirements of DoDI 1332.38 are unavailing both because that regulation does not apply to the correction boards, and because Mr. Jardon's underlying theory has been duly considered and rejected by the ABCMR and the PDBR.  Mr. Jardon has not sustained his burden of proving by a preponderance of the evidence that the correction boards were unreasonable in determining that the MEB and PEB properly considered all of Mr. Jardon's relevant conditions and their overall effect on his ability to perform his duties.

iv.    ABCMR's Consideration of VA Disability Rating

Mr. Jardon alleges that the ABCMR did not take his VA disability rating into account when it denied his request for correction of his military records.  Citing *Rominger v. United States*, Mr. Jardon argues that "the ABCMR cannot ignore VA ratings for the same unfitting conditions." Pl's. Cross-Mot. at 33 (citing *Rominger v. United States*, 72 Fed. Cl. 268 (2006) (remanding plaintiff's case to the ABCMR because it failed to "provide any explanation for why the Army should not reconsider its disability rating based on the higher disability rating provided to Mr. Rominger by the VA for precisely the same diagnosis.")).  Instead of

considering the VA's rating of his medical conditions, Mr. Jardon argues that the ABCMR impermissibly relied on the APDA's advisory opinion. Pl's. Cross-Mot. at 33 (citing AR Tab 13 at 126).  Mr. Jardon claims that the VA's disability rating is relevant to his disability rating at the time of separation because his VA medical records document that "the stressors and certainly many of the symptoms" of Mr. Jardon's conditions "existed prior to at [sic] the time of Mr. Jardon's separation."  Pl's Cross-Mot. at 36.  Thus, Mr. Jardon contends, his VA records "demonstrated the existence of a material error or injustice" that should have been corrected by the ABCMR through correction of his military records.  *Id.* (quoting *Van Cleave*, 70 Fed. Cl. at 679).  According to Mr. Jardon, therefore, the ABCMR's failure to grant Mr. Jardon relief was, arbitrary, capricious, and contrary to law.

Defendant argues that the Army rates only conditions that render a soldier unfit for duty, while the VA assesses how the soldier will function as a civilian after retirement or separation.  Def's Mot. at 33-34 (citing Army Reg. 635-40, ¶ 3-5(d) ("only unfitting conditions … will be considered in arriving at the rated degree of incapacity warranting retirement or separate for disability");  *Lockwood v. United States*, 90 Fed. Cl. 210., 219 (2008) (VA's disability determinations are based on "an evaluation of the individuals' capacity to function and perform task in the civilian world.")).  Therefore, defendant contends, VA disability ratings are not binding on the Army.  Def's. Mot. at 34 (citing *Black v. United States*, 28 Fed. Cl. 177, 184 (1993) (stating that VA ratings "may be relevant evidence" but are not "binding up on the court nor conclusive on the issues of disability"); *Lord v. United States*, 2 Cl. Ct. 749, 754 (1983) (finding that VA "ratings are not determinative of the issues involved in military disability retirement cases.")).  In Mr. Jardon's case, defendant asserts, nothing in the VA record suggested that the Army erred in its medical assessments of Mr. Jardon.  Def's. Mot. at 35.  Moreover, the VA's 60 percent disability rating, which was issued three years after Mr. Jardon's separation, was too remote in time to have any bearing on Mr. Jardon's condition at the time of his separation in April 2006.  *Id.*  Finally, defendant stresses that the ABCMR considered Mr. Jardon's VA disability rating, but rightly noted the differences between the Army's and the VA's uses of the same rating standards, and concluded that the VA's rating in this case did not demonstrate any error on the part of the Army.  *Id.* at 36.  Defendant speculates that Mr. Jardon's VA disability ratings "demonstrate that Mr. Jardon's physical and mental conditions have likely deteriorated

following separation, which is not conclusive as to his fitness at the time of separation."  Def's. Reply at 14 (citing *Unterberg v. United States*, 412 F.2d 1341, 1346 (Cl. Ct. 1969) ([T]he fact that a plaintiff's condition may have deteriorated subsequent to his release from service is not of itself determinative of the issue as to his fitness at the time of his release.")).

While both the Army and the VA use the VA's Schedule for Rating Disabilities (VASRD) to assess a soldier's disability, the ratings are based on different criteria and, thus, often differ widely.  *See Lockwood*, 90 Fed. Cl. at 219 ("[b]oth the Department of Veterans Affairs and the military service branches rely on the [VASRD], however, they do so in different ways"); *Stine v. United States*, 92 Fed. Cl. 776 (2010), *aff'd*, 417 Fed.Appx. 979 (Fed. Cir. 2011) ("[a] rating disparity between the two systems is not unusual because of the differing standards that must be applied.")).  Under Army regulations, "only the unfitting conditions … will be considered in arriving at the rated degree of incapacity warranting retirement or separation for disability."  Army Reg. 635-40, ¶ 3-5(d).  And those conditions are reviewed to determine only whether they are disqualifying for active duty.  *Id.* at ¶ 3-1 ("[i]n each case, it is necessary to compare the nature and degree of physical disability present with the requirements of the duties the Soldier reasonably may be expected to perform because of their office, grade, rank, or rating.")  On the other hand, the VA "uses the VASRD 'to determine the disability ratings based on an evaluation of the individual's capacity to function and perform tasks in the civilian world.'"  *Lockwood*, 90 Fed. Cl. at 219 (quoting *Haskins v. United States,* 51 Fed. Cl. 818, 826 (2002)).  Put another way, the Army "uses the VASRD to determine what compensation the service member is due for the interruption of his military career, while the [VA] is more holistically examining the individual's ability to engage in civilian employment."  *Stine*, 92 Fed. Cl. at 795 (citing *Slesinski v. United States,* 34 Fed. Cl. 159, 164 (1995) ("[a]n award of a higher VA rating does not establish error or injustice in the Army rating.")).  In addition, the service branch "takes a snapshot of the service member's condition at the time of separation from the service, while the []VA evaluates and adjusts disability ratings throughout the individual's lifetime."  *Stine*, 92 Fed. Cl. at 776 (citing *Pomeroy v. United States,* 30 Fed. Cl. 213, 219 & n. 11 (1997)).

Because of these very different goals, a VA rating decision is not binding on the service branch.  *See Chambers v. United States*, 417 F.3d at 1225; *Bennett v. United States*, 200 Ct. Cl. 635, 643-44 (1973);

*Unterberg*, 412 F.2d at 1346; *Williams v. United States*, 186 Ct. Cl. 611, 614, 405 F.2d 890, 891-92, *cert. denied*, 396 U.S. 966 (1969), *reh'g denied*, 396 U.S. 1047 (1970).  "Moreover, retroactive application of a VA diagnosis and attendant disability rating, to a much earlier PEB disability assessment for retirement purposes, which had not identified any psychological symptoms, is not warranted."  *Lockwood*, 90 Fed Cl. at 219.

According to the records before the court, Mr. Jardon was first assigned a disability rating by the VA in November 2007, or approximately 18 months after his separation from the Army.  At that time, Mr. Jardon was assigned a 10 percent disability rating for each labyrinthitis, tinnitus, and paralysis of median nerve on both hands, putting his overall disability rating at 40 percent.  AR Tab 20 at 217.  The VA raised Mr. Jardon's disability rating to 60 percent in February 2008, or nearly two years after his separation, based on diagnoses of PTSD, bilateral hearing loss, vertigo, bilateral tinnitus, and cubital tunnel syndrome with ulnar nerve neuralgia for both his left and right upper extremities.  AR Tab 14 at 162-63.  The VA increased Mr. Jardon's disability rating again on November 4, 2009, from 60 to 80 percent.  AR Tab 14 at 180.

The ABCMR's first decision in Mr. Jardon's case, issued on April 23, 2009, addressed the differences between disability ratings given by the Army versus disability ratings given by the VA.  Under the heading "Consideration of Evidence," the ABCMR decision included the following paragraph regarding the differences between the Army's and the VA's respective uses of disability ratings:

> Title 38, U.S. Code, sections 1110 and 1131, permit the VA to award compensation for disabilities which were incurred in or aggravated by active military service.  However, an award of a higher VA rating does not establish error or injustice in the Army rating.  An Army disability rating is intended to compensate an individual for interruption of a military career after it has been determined that the individual suffers from an impairment that disqualifies him or her from further military service.  The VA, which has neither the authority, nor the responsibility for determining physical fitness for military service, awards disability ratings to veterans for conditions that

it determines were incurred during military service and subsequently affect the individual's civilian employability. Accordingly, it is not unusual for the two agencies of the Government, operating under different policies, to arrive at a different disability rating based on the same impairment. Furthermore, unlike the Army, the VA can evaluate a veteran through his or her lifetime, adjusting the percentage of disability based upon that agency's examinations and findings. The Army rates only conditions determined to be physically unfitting at the time of discharge, thus compensating the individual for loss of a career; while the VA may rate any service connected impairment, including those that are detected after discharge in order to compensate the individual for loss of civilian employment.

AR Tab 13 at 125-26. The ABCMR's April 23, 2009 decision also stated, in the "Discussion and Conclusions" section:

The evidence of record shows that the Army rates only conditions determined to be physically unfitting that were incurred or aggravated during the period of service. Furthermore, it can rate a condition only to the extent that the condition limits the performance of duty. The VA (and some other government agencies) on the other hand, provides compensation for disabilities which it determines were incurred in or aggravated by active military service and which impair the individual's industrial or social functioning. Moreover, the law requires the VA must give the benefit of any reasonable doubt. The fact that the VA (or any other government agency), in its discretion, awarded the applicant a higher disability rating than that which he received from the U.S. Army, is a prerogative exercised within the policies of that agency.

AR Tab 13 at 126-27. The ABCMR's April 23, 2009 decision, thus, documented the different uses of the VASRD rating system by the Army and the VA, respectively, and explained that the VA's disability rating had no bearing on whether the Army correctly rated Mr. Jardon's disability at the time of his separation.

Similarly, the ABCMR's second decision, dated February 18, 2010, noted that the VA had raised Mr. Jardon's disability rating from 60 percent to 80 percent, based on his PTSD with major depression, bilateral hearing loss, vertigo, bilateral tinnitus, cubital tunnel syndrome with left upper extremity ulnar nerve neuralgia, and cubital syndrome with right upper extremity ulnar nerve neuralgia.  However, the decision by the VA to award Mr. Jardon an 80 percent disability rating "d[id] not demonstrate an error or injustice on the party of the Army," the ABCMR explained.  AR Tab 3 at 9. The ABCMR's February 18, 2009 decision stated, "[t]he VA, in accordance with its own policies and regulations, awards compensation solely on the basis that a medical condition exists and that said medical condition reduces or impairs the social or industrial adaptability of the individual concerned."  Thus, in its second decision, the ABCMR acknowledged Mr. Jardon's 80 percent disability rating from the VA, but concluded that the VA rating did not show that there had been any error on the part of the Army in rating Mr. Jardon as 10 percent disabled at the time of his separation in 2006.

The ABCMR considered Mr. Jardon's VA disability ratings as evidence in both its April 23, 2009, and February 18, 2010 decisions, but determined that the VA's ratings did not have any bearing on Mr. Jardon's physical disability at the time of his separation.  Mr. Jardon's case is distinguishable from *Rominger*.  In that case, the MEB determined that the plaintiff did not meet retention standards because he suffered from "recurrent herniation of the nucleus pulposus at L4-5 with chronic postoperative back and leg pain."  *Rominger*, 72 Fed. Cl. at 270.  The PEB examined the plaintiff and found that his "chronic low back pain" rendered him unfit for duty.  The PEB awarded the plaintiff a disability rating of 20 percent on August 26, 1999.  *Id*.  The plaintiff was separated from the Army with a disability rating of 20 percent on November 30, 1999.  "On January 12, 2000, less than two months after he had left the Army, the VA awarded Mr. Rominger a disability rating of 40 percent," based on his "intervertebral disc syndrome."  *Id*. at 271.  While the Army had used diagnostic code VASRD 5293 to determine the plaintiff's disability, the VA used VASRD 5295, despite the fact that it was rating the same condition.

The plaintiff applied to the ABCMR for correction of his military records based on that different rating, but the ABCMR denied his application, stating:

> 7. The applicant provided no evidence that his disability was improperly rated in accordance with VASRD or that his separation with severance pay was not in compliance with law and regulation.
>
> 8. The rating action by the DVA does not necessarily demonstrate any error or injustice in the Army rating. The DVA, operating under its own policies and regulations, assigns disability ratings as it sees fit.  Any rating by the DVA does not compel the Army to modify its rating.
>
> 9. The applicant's contentions do not demonstrate error or injustice in the disability rating assigned by the Army, nor error or injustice in the disposition of his case by his separation from the service.

*Id.* at 271-72.  The U.S. Court of Federal Claims found that a remand was necessary in *Rominger* because "the ABCMR did not provide any explanation for why the Army should not reconsider its disability rating based on the higher disability rating provided to Mr. Rominger by the VA for precisely the same diagnosis" just two months after his separation.  *Id.* at 273.  The court declined to find that the ABCMR's decision was arbitrary and capricious, but remanded the plaintiff's case to the ABCMR.  *Id.* at 273-74.

Unlike the plaintiff in *Rominger*, who was given a 40 percent disability rating for the same condition that the PEB had rated at 20 percent just several months before, Mr. Jardon was not evaluated by the VA for approximately 18 months after his separation.  *See Rominger*, 72 Fed. Cl. at 271.  The time component is important, because the Army's disability rating "takes a snapshot of the service member's condition at the time of separation from the service."  *Stine*, 92 Fed. Cl. 776 (citing *Pomeroy v. United States,* 30 Fed. Cl. 213, 219 & n. 11 (1997)).  The VA, on the other hand, "evaluates and adjusts disability ratings throughout the individual's lifetime."  *Id.*  Thus, Mr. Jardon's condition in November 2007 could have been very different than it was at the time of his separation in April 2006.

Moreover, while the plaintiff in *Rominger* was given a higher disability rating by the VA than by the PEB for "precisely the same diagnosis," the VA's 2007 disability rating for Mr. Jardon took into account additional conditions, as compared to the PEB.  *See Rominger*, 72 Fed. Cl. at 273.  The PEB found Mr. Jardon unfit for duty based only on his chronic left wrist pain and awarded him a 10 percent disability rating for that condition only. AR Tab 24 at 239.  The VA first rated Mr. Jardon as 40 percent disabled based on four conditions: labyrinthitis, tinnitus, and paralysis of median nerve on both hands.  AR Tab 20 at 217.  Additional conditions were noted when Mr. Jardon's VA disability rating was raised to 60 percent, and 80 percent, respectively, including PTSD, bilateral hearing loss, and vertigo. AR Tab 14 at 162-63, 180.  Mr. Jardon's case is, thus, very different from the plaintiff's in *Rominger*, as Mr. Jardon's higher VA disability ratings were given far after his time of separation, and were based on different medical conditions than his Army disability rating.

The ABCMR's two decisions in Mr. Jardon's case acknowledged that Mr. Jardon was given a higher disability rating by the VA than by the PEB, but concluded that the VA's subsequent disability ratings did not demonstrate a clear error or injustice on the part of the Army in awarding Mr. Jardon a 10 percent disability rating at the time of his separation. AR Tab 13 at 126-27, Tab 3 at 9.  It is well-established that a VA rating decision is not binding on the Army.  *See Chambers*, 417 F.3d at 1225; *Bennett*, 200 Ct. Cl. at 643-44; *Unterberg*, 412 F.2d at 1346 (1969); *Williams*, 405 F.2d at 891-92.  Mr. Jardon's first VA disability rating was issued 18 months after his separation and accounted for conditions other than the chronic left wrist pain, which served as the basis for the PEB's disability rating.  It is also worth noting that, between 2007 and 2009, the VA raised Mr. Jardon's disability rating from 40 to 80 percent.  In other words, over a two-year period, the VA found that Mr. Jardon's health had deteriorated such that a 40 percent increase in his disability rating was warranted.  It, thus, does not defy reason to suggest that Mr. Jardon's health conditions could similarly have deteriorated between April 2006, the time of his discharge, and November 2007, when the VA granted Mr. Jardon a 40 percent disability rating, such that a jump from 10 to 40 percent was reasonable.  Ultimately, Mr. Jardon fails to demonstrate that the ABCMR was arbitrary, capricious, or acting contrary to law in finding that the VA's disability ratings did not demonstrate that there was any error or injustice in the Army's disability rating of 10 percent for one left wrist condition at the time of Mr. Jardon's separation in April 2006.

v.     PDBR's Limitation to DES Record

Mr. Jardon argues that the PDBR's decision was contrary to law because the PDBR refused to consider Mr. Jardon's right arm condition on the basis that it was not addressed in Mr. Jardon's DES file.  Pl's. Cross-Mot. at 19.  The PDBR stated, regarding Mr. Jardon's right arm condition:

> As this condition was not addressed in the DES file, it is outside the scope of the Board to adjudicate.  Only conditions specifically noted in the DES submission (MEB Physical, NARSUM and PEB documents) are reasonable for Board recommendations as additionally unfitting for service disability rating.  With this precedence, no additional disability for this condition can be granted.

AR Tab 7 at 19.  Mr. Jardon argues that this rationale was arbitrary and inconsistent with applicable regulations because: 1) it "perpetuate[d] the failure of Mr. Jardon's MEB to 'document the full clinical information of all medical conditions' as required by DoDI 1332.38;" 2) it ignored the VA's disability rating of Mr. Jardon; 3) 10 U.S.C. 1554a states that the PDBR shall review "records of the armed force concerned and such other evidence as may be presented to" the PDBR, but instead the PDBR limited itself to only the DES submission; and 4) the PDBR's definition of the DES submission is arbitrary and excludes documents that should have been reviewed.   Pl's. Cross-Mot. at 19-20.  Ultimately, Mr. Jardon contends, there was independent evidence of his right arm condition available for PDBR review and, by law, the PDBR was required to review all evidence submitted.  *Id.* at 27.

Moreover, Mr. Jardon argues that the PDBR engaged in circular logic when it stated that the 2006 electrodiagnostic study of Mr. Jardon's left and right arms was not part of the DES submission, but was part of his medical records and should have been reviewed by the PEB.  *Id.* at 21.  Mr. Jardon maintains that his right arm condition was part of his DES submission because it was addressed in his military medical records and it should, therefore, have been reviewed by the PDBR.  *Id.* at 22.  If the PDBR found that it did not have enough information to properly review the condition, Mr. Jardon asserts, the PDBR should have concluded that that lack of information was the result of an incomplete MEB and PEB proceeding and remanded his case.

Defendant argues that the PDBR considered every medical condition that Mr. Jardon asserted, including those not rated by the PEB.  Def's. Mot. at 32.  Specifically, defendant contends that the PDBR did consider the evidence regarding Mr. Jardon's right arm condition.  The PDBR noted that Mr. Jardon "did not mention any right forearm or wrist complaints" at the time of the MEB, and there was "no evidence of any functional impairment relating to … any right upper extremity disability."  Def's. Reply at 11(citing AR Tab 7at 19).  The PDBR's finding that it could not re-characterize the right arm condition rating because it was "not mentioned in the PEB paperwork," was a correct interpretation of the PDBR's limited authority to review findings of the PEB, defendant asserts.  *Id.* (citing 10 U.S.C. § 1554a(c)(1) ("[t]he Physical Disability Board of Review shall review the findings and decisions of the Physical Evaluation Board with respect to such covered individual.")).  Defendant argues that, if Mr. Jardon wished to be evaluated for a right arm condition, he should have raised that condition during the MEB or PEB proceeding; however, he did not, and he elected not to appeal the findings of those bodies.  *Id.*  Under those circumstances, defendant concludes, it was proper for the PDBR to refuse to adjudicate the right arm condition.

As stated above, the PDBR was established by statute in 2008 to review cases of service members who: "(1) are separated from the armed forces due to unfitness for duty due to a medical condition with a disability rating of 20 percent disabled or less; and (2) are found to be not eligible for retirement."  10 U.S.C. § 1554a(b)(1)-(2).  The PDBR is tasked with reviewing the findings of the PEB for a covered individual.  *Id.* at § (c)(1).  The PDBR's review "shall be based on the records of the armed force concerned and such other evidence as may be presented to the Physical Disability Board of Review. A witness may present evidence to the Board by affidavit or by any other means considered acceptable by the Secretary of Defense."  *Id.* at § (c)(2).  DoDI 6040.44 governs the policies and procedures of the PDBR.  It provides at Enclosure 3, ¶ 1: "[a]s part of its review, the PDBR may, at the request of an eligible member … , review conditions identified but not determined to be unfitting by the PEB of the

Military Department concerned." DoDI 6040.44, Encl. 3, ¶ 1 (2009). DoDI 6040.44 also states at Enclosure 5:

> a.  The Military Departments shall obtain records and other information required for review of cases by the PDBR.
>
> (1)  Evidence to be reviewed by the PDBR will be primarily documentary in nature.
>
> (2)  All new or newly discovered records or other relevant evidence gathered and considered by the PDBR will be made a part of the Service member's PEB records and maintained in accordance with regulations pertaining to that system of records.
>
> (3)  A witness may present evidence to the Board by affidavit or by any other means considered acceptable by the Lead Component.
>
> (4)  If the Service member indicates that a DVA disability award has been made, the applicant shall be requested to provide a copy of the DVA determination letter and sign a release form authorizing the PDBR access to the information.  The Military Departments will obtain DVA rating determinations issued on behalf of the former Service member.  Once obtained, the PDBR should compare any DVA disability rating for the specifically military unfitting condition(s) with the PEB combined disability rating and consider any variance in its deliberations and any impact on the final PEB combined disability rating, particularly if the DVA rating was awarded within 12 months of the Service member's separation.

DoDI 6040.44, Encl. 5, ¶ (a)(1)-)(4).  Thus, by statute and regulation, the PDBR is permitted to consider evidence put forth by a service member, including a VA disability rating.  However, the PDBR is limited to reviewing

the medical conditions identified by the PEB.  DoDI 6040.44, Encl. 5, ¶
(e)(2).

With respect to Mr. Jardon's right cubital tunnel syndrome, the PDBR
stated in full:

> The NARSUM noted "Right wrist was within normal limits."
> Right shoulder problem (pain/popping) was noted in the MEB
> H&P, but right wrist, hand or arm conditions are not otherwise
> mentioned in the PEB file.  The 20060117 [January 17, 2006]
> electrodiagnostic study was in the Service medical records
> provided to the Board and should have been considered by the
> PEB.
>
> Following exam of 20070924 [September 24, 2007], the VA
> rated this condition at 10% for neuralgia; "Sensory function is
> abnormal within findings of intermittent numbness and tingling
> that radiates along the forearm to the last two digits of the hand.
> Reflexes were with normal limits.  An evaluation of 10 percent
> is assigned for incomplete paralysis of hand movements which
> is mild."
>
> The DES file did not contain any abnormalities of the right
> upper extremity except for right shoulder pain.  The CI's
> [Mr. Jardon's] right upper extremity sensation and diagnostic
> abnormalities in the records should have been available to the
> PEB even though his right cubital tunnel syndrome with
> peripheral neuropathy was not listed on the CI's MEB.
> However, there was no evidence of any functional impairment
> related to this diagnosis or any right upper extremity disability or
> duty limitation in the record.  The MEB history and physical and
> the DES package did not mention any right forearm or wrist
> complaints.  The 20090227 [February 27, 2009] Advisory
> Opinion to the ABCMR noted (excerpt): "Even if the peripheral
> polyneuropathies were listed on the applicant's MEB they would
> not have been found unfitting as there was <u>no evidence of any</u>

<u>adverse functional impairment relating to the upper extremities</u>.
He may have had some sensation and diagnostic
abnormalities, but performance wise the evidence would not
have supported a finding of unfit for duty for this condition."
The ABCMR adjudicated the not-unfitting nature of this
abnormal test without a clear tie into limitations of performance
of Soldier duties or MOS requirements.  As this condition was
not addressed in the DES file, it is outside the scope of the
Board to adjudicate.  Only conditions specifically noted in the
DES submission (MEB physical, NARSUM, and PEB
documents) are reasonable for Board recommendation as
additionally unfitting for service disability rating.  With this
precedence [sic], no additional disability for this condition can
be granted.  Any request for reconsideration for the condition
rests with the CI's Service BCMR.

AR Tab 7 at 18-19 (emphasis added).  Thus, the PDBR considered all of
the documentary evidence that Mr. Jardon put forward regarding his right
arm condition, including the VA's disability rating of 10 percent for right
cubital tunnel syndrome.  However, the PEB identified only three conditions
in its evaluation of Mr. Jardon: 1) chronic left wrist pain, 2) cubital tunnel
syndrome in his left wrist, and 3) difficulty sleeping.  AR Tab 24 at 239.
Mr. Jardon's right arm condition was not identified by the PEB.  Thus, the
PDBR properly found that it could not grant Mr. Jardon a higher disability
rating based on his right arm condition.

 With regard to Mr. Jardon's right arm condition, the PDRB properly
reviewed all of the evidence presented, including Mr. Jardon's MEB and
PEB files, his VA disability rating, the ABCMR's April 23, 2009 decision,
and the APDA's advisory opinion.  However, because the PEB did not
identify any right arm condition in Mr. Jardon's proceeding, the PDBR
properly determined that Mr. Jardon could not be granted a higher disability
rating based on that condition.  Mr. Jardon has failed to demonstrate that
the PDBR's determination regarding his right arm condition was arbitrary,
capricious, or contrary to law.

### vi.   PDBR's Reliance on APDA's Advisory Opinion

Plaintiff also alleges that the PDBR decision "failed to meet regulatory and statutory requirements" because the PDBR relied on the APDA's advisory opinion. Pl's. Cross-Mot. at 18.  Plaintiff goes on to allege that the APDA's advisory opinion was erroneous because it failed to mention that the MEB and PEB proceedings in Mr. Jardon's case were "noncompliant with numerous regulations and policies." Pl's. Cross-Mot. at 23.  According to Mr. Jardon, the advisory opinion should have concluded that the MEB and PEB were noncompliant with DoDI 1332.38 and recommended that a new evaluation be conducted. *Id.*  In addition, Mr. Jardon claims that the advisory opinion misapplied DoDI 1332.39 in his case.  While Mr. Jardon criticized the APDA's advisory opinion, however, he did not specifically allege how the PDBR's decision in his case was arbitrary, capricious, or contrary to law for referencing the APDA's advisory opinion.

The Court asked the parties at oral argument to supply the regulatory authority establishing that Mr. Jardon's case was properly referred to the APDA for an advisory opinion.  In response, plaintiff submitted DoDI 1332.18 and Army Reg. 635-40, pointing specifically to Army Reg. 635-40, ¶ 4-22a(2).  DoDI 1332.18 governs processing service members who have been referred for physical disability evaluation, but does not make any mention of the APDA.  *See* DoDI 1332.28, ¶ 1.4 (2003).  Army Reg. 635-40, ¶ 4-22(a) provides that the APDA must review seven types of cases, however Mr. Jardon's case does not fall into any of the seven categories listed.  Plaintiff specifically points to ¶ 4-22(a)(2), which states that the APDA must review "[i]nformal proceedings when the Solider nonconcurs with the PEB findings and recommendations, waives a formal hearing, submits a statement of rebuttal within the required time frame, and consideration of the rebuttal by the PEB does not result in a change to its findings and recommendations." Army Reg. 635-40, ¶ 4-22(a)(2). However, Mr. Jardon concurred with the informal PEB proceeding in his case, so this provision is not applicable to Mr. Jardon's case.  Defendant, on the other hand, submitted Army Reg. 15-185, which governs the proceedings of the ABCMR, and pointed to ¶ 2-2(c), which states:

> The ABCMR will decide cases on the evidence of record.  It is not an investigative body.  The ABCMR may, in its discretion, hold a hearing (sometimes referred to as an evidentiary hearing or an administrative hearing in 10 USC 1034 and DODD

7050.6) or request additional evidence or opinions.

Army Reg. 15-185, ¶ 2-2(c) (2006).  While Army Reg. 15-185 does not specifically reference the APDA, ¶ 2-2(c) does seem to establish that the ABCMR is permitted to seek additional opinions when deciding a service members' claim.  Thus, it appears that the ABCMR had the authority to refer Mr. Jardon's case to the APDA for an advisory opinion.

Mr. Jardon now challenges the PDBA's "reliance on" the APDA advisory opinion.  DoDI 6040.44, governing the procedures of the PDRB, provides, in relevant part: "[t]he PDBR President may also obtain the advice and assistance of specialized medical authorities for cases involving those respective medical disabilities, if needed.  Any assistance provided by the medical authorities will be documented in the covered individual's case."  DoDI 6040.44, Encl. 5, ¶ d.  This provision supports the position that the PDBR could properly consider an advisory opinion from the APDA, provided that the PDBR documented that in its written decision, which it did in Mr. Jardon's case.  In addition, it supports the position that the PDBR could consider the ABCMR's decision in Mr. Jardon's case, which in turn relied on the APDA advisory opinion.

Mr. Jardon fails to put forth any evidence that the PDBR's decision was arbitrary, capricious, or contrary to law for referencing the APDA's advisory opinion.

       vii.    PTSD Diagnosis

Mr. Jardon alleges that both the ABCMR and PDBR acted arbitrarily and capriciously in determining that the Army was justified in not assigning a disability rating for his PTSD at the time of his separation.  Pl's. Resp. at 6.  He argues that his VA records indicate that the Army missed a diagnosis of PTSD at the time of his separation in April 2006.  Pl's. Cross-Mot. at 28.  The VA's April 20, 2009 Rating Decision stated, regarding PTSD:

> The examiner's diagnosis is post traumatic stress disorder (PTSD) with major depression.  The examiner noted the diagnoses are related and that the secondary diagnosis does represent a progression of the primary diagnosis.  You are

> unable to separate your symptoms and **the beginning of both
> appears almost simultaneous**.  The symptoms of each
> mental disorder cannot be delineated from each other.

Pl's. Cross-Mot. at 28 (quoting AR Tab 10 at 73) (emphasis added).
Mr. Jardon reasons that, because his depression was documented in
January 2006, three months prior to his separation, and the VA decision
states that his depression and PTSD began simultaneously, his PTSD
necessarily manifested itself before his separation and should have been
diagnosed simultaneously with his depression in January 2006.  Pl's. Resp.
at 6-7.  The PDBR stated that there was no missed diagnosis of PTSD at
the time of Mr. Jardon's separation.  AR Tab 9 at 28.  Mr. Jardon argues
that the PDBR's analysis arbitrarily ignores the evidence from the VA
records, which were before both the ABCMR and the PDBR.  Pl's. Mot. at
29.

Defendant argues that the ABCMR and the PDBR determined, based
on substantial evidence, that the Army was justified in not rating Mr. Jardon
for PTSD in 2006.  Def's. Reply at 6.  Defendant points to a psychological
evaluation performed on Mr. Jardon by Dr. Ben Phillips on September 26,
2005.  Dr. Phillips concluded, at that time, that he did "not feel that
[Mr. Jardon] suffers from a psychiatric disorder that warrants inclusion in
his medical evaluation board."  *Id.* (citing AR Tab 25 at 256).  Defendant
maintains that the MEB evaluated Mr. Jardon for PTSD, but concluded that
his symptoms did not support a PTSD diagnosis.  Def's. Reply at 6.
Defendant disputes Mr. Jardon's reasoning that, because he had
manifested signs of depression as early as January 2006, and the VA
stated that his diagnose of depression and PTSD "began 'almost
simultaneously,'" his PTSD necessarily should have been diagnosed in
January 2006.  *Id.* at 6-7  (quoting Pl's. Cross-Mot. at 28-29 (quoting
AR Tab 10 at 73)).  The VA's records do not establish that Mr. Jardon's
depression and PTSD commenced simultaneously, defendant contends.
Even if the court were to interpret the VA's rating decision in favor of
Mr. Jardon, defendant states, "at best, that demonstrates a reasonable
disagreement with the Army's evaluation of medical evidence."  *Id.* at 7.
Defendant stresses that the VA did not diagnose Mr. Jardon with PTSD

until 2008, nearly two years after he was separated from the Army, and maintains that nothing in the VA records demonstrates that the Army erred in not diagnosing him earlier.  *See id.* at 7 (citing AR Tab 10 at 72).

Mr. Jardon responds that, for the government to admit that Mr. Jardon suffers from PTSD now, but argue that he did not in 2006 "is inconsistent with following": "(1) the causes of PTSD (i.e., traumatic events threatening death) occurred before Mr. Jardon's separation from the Army, and 2) the symptoms of PTSD (i.e., depression, intense fear, anxiety, sleeplessness) existed before Mr. Jardon's separation."  *Id.* at 8. Mr. Jardon stresses that the ABCMR and PDBR "acted arbitrarily and capriciously in failing to give proper weight to these facts" and to ensure that the MEB and PEB properly assessed Mr. Jardon's condition.  Finally, Mr. Jardon amended his pleadings to cite *Russell v. United States*, which he claims "is authority for the proposition that the determination of a 0% disability rating by a Physical Evaluation Board for a service member's post-traumatic stress disorder (PTSD) due to lack of reportable symptoms or diagnosis while on active duty was not supported by substantial evidence."  Plaintiff's Motion for Leave to Amend Its Pleadings at 2 (citing *Russell v. United States*, 102 Fed. Cl. 9 (2011).

As noted above, ABCMR proceedings are governed by 32 C.F.R. § 581.3, which states that the ABCMR will "[r]eview all applications that are properly before [it] to determine the existence of error or injustice." 32 C.F.R. § 581.3(b)(4)(i-iii) (2013).  The ABCMR "decide[s] cases on the evidence of record."  *Id.* § 581.3(c)(2)(iii).  However, "[t]he ABCMR begins its consideration of each case with the presumption of administrative regularity. The applicant has the burden of proving an error or injustice by a preponderance of the evidence."  *Id.* § 581.3(e)(2).

As also indicated previously, DoDI 6040.44, governing the procedures of the PDRB provides that, if a service member has a VA disability rating that they bring to the attention of the PDBR, "the PDBR should compare any DVA disability rating for the specifically military unfitting condition(s) with the PEB combined disability rating and consider any variance in its deliberations and any impact on the final PEB combined disability rating, particularly if the DVA rating was awarded within 12 months of the Service member's separation."  DoDI 6040.44, Encl. 5, ¶ (a)(4).  However, the PDRB is limited to reviewing the medical conditions identified by the PEB.  DoDI 6040.44, Encl. 5, ¶ (e)(2).

In its first decision in Mr. Jardon's case, dated April 23, 2009, the ABCMR considered all of the medical records which Mr. Jardon had submitted, including VA records discussing Mr. Jardon's PTSD symptoms and diagnosis. Mr. Jardon specifically raised the issue of his PTSD diagnosis in the supporting documents accompanying his ABCMR application. The ABCMR's April 23, 2009 decision concluded that none of the evidence in Mr. Jardon's case indicated "that the Army misapplied either the medical factors involved or the governing regulatory guidance concerning the applicant's disability processing." AR Tab 13 at 127. Thus, the ABCMR considered all of the evidence put forth by Mr. Jardon, but concluded that he failed to meet the burden of proving an error or injustice in his case by a preponderance of the evidence based on his PTSD diagnosis, or any of the other conditions he alleged were misdiagnosed or misevaluated by the MEB and PEB.

In its second decision, issued on February 18, 2010, the ABCMR again considered all of the evidence put forth by Mr. Jardon, including the VA's April 10, 2009 Rating Decision, which raised Mr. Jardon's disability rating due to PTSD to 30 percent effective as of February 26, 2008, and his overall disability rating to 60 percent. The ABCMR acknowledged that Mr. Jardon was being treated by the VA for PTSD with major depression, bilateral hearing loss, vertigo, bilateral tinnitus, and cubital tunnel syndrome of both the left and right wrists. However, based on all of the evidence put forth, the ABCMR again concluded that there was no evidence that Mr. Jardon "was unable to perform his duties due to vertigo, PTSD, back pains, or hearing loss at the time of his MEB on 16 December 2005." AR Tab 3 at 9. Therefore, the ABCMR found that there was no evidence that established, by a preponderance of the evidence, that there was an error or injustice in the Army's determination that Mr. Jardon did not deserve a disability rating for PTSD at the time of his separation. AR Tab 3 at 9.

Finally, the PDBR went through each of Mr. Jardon's alleged conditions individually ,and discussed the available evidence regarding each. Regarding PTSD with major depression, the PDRB first pointed to Dr. Phillip's September 2, 2005 psychiatric evaluation of Mr. Jardon, which found that there was no "psychiatric disorder that warrants inclusion in his medical evaluation board." AR Tab 7 at 20 (citing AR Tab 25 at 256). The PDRB then noted that, in 2005, an Army physician noted that Mr. Jardon

was experiencing adjustment disorder with anxiety, adjustment disorder, anxiety disorder, and adjustment disorder with anxiety and depressed mood in 2006.  AR Tab 7 at 20 (citing AR Tab 25 at 258-59).  However, the PDBR indicated, that there were no diagnoses of major depression or PTSD in Mr. Jardon's service treatment records.  The PDRB then looked to the APDA advisory opinion, which concluded that Mr. Jardon's difficulty sleeping was not unfitting and that Mr. Jardon "had no significant psychiatric symptoms that would result in any psychiatric diagnosis or required treatment."  AR Tab 7 at 20 (citing AR Tab 27 at 184).  The PDRB also noted that the ABCMR adjudicated Mr. Jardon's claim and found that he did not have any mental health disability which rose to the level of unfitting.  Next, the PDBR acknowledged that the VA had rated Mr. Jardon with PTSD and major depression on March 25, 2008, and had rated that condition at 30 percent effective as of February 26, 2008.  The PDBR concluded, however, that the VA's diagnosis of Mr. Jardon in 2008 "does not indicate any missed diagnosis at the time of separation."  The PDBR's decision continued:

> There is evidence in the VA records and material supplied by the CI [Mr. Jardon] that his mental health conditions worsened following service discharge.  There is no evidence in the record that difficulty from any mental health condition adversely impacted the CI's performance of his duties, or would/should have led to separation.  No mental health condition rose to the level of unfitting.

AR Tab 7 at 20.

Thus, both the ABCMR and the PDBR considered all of the evidence that Mr. Jardon put forth regarding his PTSD, including the VA's diagnosis of PTSD with major depression and records discussing his symptoms and treatment.  However, both correction boards were limited in what they could review.  The ABCMR could only assess whether Mr. Jardon proved by a preponderance of the evidence that there was error or injustice in the Army's decision to separate Mr. Jardon from service with a 10 percent disability rating in April 2006.  The ABCMR decided, on two occasions, that Mr. Jardon could not meet that burden.  Similarly, the PDBR was limited to reviewing the medical conditions identified by the PEB.  In Mr. Jardon's case, the PEB did not identify PTSD as a potential condition, nor find it

unfitting.  Thus, the PDBR was unable to grant Mr. Jardon any relief based on his PTSD diagnosis.

Moreover, Mr. Jardon's case is distinguishable from *Russell v. United States*.  In *Russell*, a Marine deployed in Iraq had a grenade explode in his hands.  *Russell*, 102 Fed. Cl. at 10-11.  He was discharged in September 2003.  He was later treated for PTSD by the VA in 2008.  The plaintiff filed suit at the U.S. Court of Federal Claims on May 14, 2008.  The case was remanded to the Navy PEB.  An informal PEB found that the plaintiff was fit for duty, as neither his hand injuries nor his PTSD rendered him unfit.  *Id*. at 11-12.  The plaintiff demanded a formal hearing, at which he introduced documentary evidence and testimony from two treating physicians.  The formal PEB found the plaintiff unfit for duty, but denied any disability rating for his PTSD.  *Id*. at 12.  The plaintiff submitted a petition for review, but the PEB Director upheld the formal PEB's findings.  *Id*. at 13.  The plaintiff then amended his complaint to argue that the PEB's findings were erroneous.  The plaintiff argued that the authority for diagnosis of PTSD is the Diagnostic and Statistical Manual of Mental Disorders, versions IV and IV-TR, both of which recognize that PTSD is a delayed onset disease, and that experts agree that, while symptoms of PTSD may not manifest for months or even years, the symptoms must be imputed back to the time of the traumatic event.  *Id*. at 15-16.  The plaintiff also put forth evidence that the plaintiff has tested positive for PTSD in June 2004, just seven months after his discharge.  Moreover, one of plaintiff's experts had testified that the evidence overwhelmingly supported that plaintiff suffered from PTSD.  *Id*. at 16.  Under those circumstances, the court found that the PEB's decision that the plaintiff warranted no disability rating for his PTSD was not supported by substantial evidence.  *Id*. at 17.

Unlike the plaintiff in *Russell*, who challenged the findings of both the informal and the formal PEB in his case, Mr. Jardon concurred with the informal PEB's finding that Mr. Jardon had only one medically unfitting condition, chronic left wrist pain, thereby waiving his right to a formal PEB proceeding, as well as his right to judicial review of the informal PEB's decision.  *See Russell*, 102 Fed. Cl. at 11-12.  Thus, the court cannot review the MEB's and PEB's determinations that Mr. Jardon did not have PTSD in 2005 or 2006, but rather can only review the ABCMR's and PDRB's determinations.  In addition, the plaintiff in *Russell* tested positive for PTSD closer in time to his discharge from the Navy than did Mr. Jardon, seven months as opposed to Mr. Jardon's diagnosis nearly two years after

his separation.  *See id.* at 16.  Furthermore, the plaintiff in *Russell* put forth medical evidence about PTSD and the fact that it is a delayed onset disease, as well as testimony from his treating physician.  *See id.* at 15-17. There is no similar evidence in the Administrative Record in Mr. Jardon's case.

While the court is not insensitive to Mr. Jardon's health conditions, nor unmindful of the fact that VA records state that Mr. Jardon's PTSD and depression are related and that the beginning of both was likely simultaneous, that one statement from by the VA, made on April 10, 2009, is not sufficient evidence to prove that the Army's decision to not award Mr. Jardon a disability rating for PTSD in 2006 was arbitrary and capricious.  Nor does the VA's statement demonstrate that the ABCMR was arbitrary, capricious, or acting contrary to law in finding, in 2009 and 2010, that there was not enough evidence to find error or injustice in Mr. Jardon's case.  Finally, the VA's statement does not demonstrate that the PDRB was arbitrary, capricious, or acting contrary to law by finding that it could not re-characterize Mr. Jardon's disability rating based on his PTSD diagnosis, when the PEB did not identify PTSD as one of Mr. Jardon's conditions, and the PDBR was limited to reviewing conditions identified by the PEB.

## CONCLUSION

For the reasons stated above, the court **GRANTS defendant's Motion for Judgment on the Administrative Record**, and **DENIES plaintiff's Cross-Motion for Judgment on the Administrative Record**. Plaintiff's Complaint is hereby **DISMISSED**.  The Clerk of Court shall enter **JUDGMENT** in favor of the defendant.  The parties are to bear their own costs.

**IT IS SO ORDERED**.

s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge